Syllabus.

S. D. WARD, Receiver,

*v.*

S. J. JOHNSON *et al.*

*Filed at Ottawa May 18, 1880.*

1. MERCHANTS, FARMERS AND MECHANICS' BANK—*of its powers.* The Merchants, Farmers and Mechanics' Savings Bank of Chicago, under its charter, has express power to receive deposits, and possesses the power, by necessary implication, to receive money as a loan, nor can the right to assign or mortgage negotiable instruments which it is authorized to take, be questioned.

2. CORPORATIONS—*power to contract debts, etc.* A private corporation has implied power to contract debts, like an individual, whenever necessary or convenient in furtherance of its legitimate business, and whenever it may contract a debt it may borrow money to pay it, and execute a negotiable bill, note or bond, and secure it by mortgage to the creditor in payment.

3. SAME—*estoppel to plead ultra vires.* Where a bank creates an investment department as one agency of its business, under which parties loaning money to the bank, or making deposits, are secured by a deed of trust for the payment of their loans or deposits, with interest, under which the bank receives large sums of money, on the faith of the security, which goes into its general business, the bank, after having the full benefit of the contract, will not be allowed to interpose the defence of *ultra vires* to defeat the execution of the trust.

4. SAME—*who bound by its by-laws.* The general rule is that the by-laws of a corporation are binding upon no one but its members and officers. Hence, a by-law directing the investment of savings deposits in certain securities is binding on the members and officers of the corporation, but not upon others dealing with the corporation.

5. BANKS—*power to provide an investment department secured by an assignment to a trustee.* Where a bank, by its charter, is authorized to contract and agree with persons desiring to make deposits or loan money, as to the terms, and give for the sum its note, bond or certificate as evidence of indebtedness, and secure the same by pledge, chattel mortgage, note, securities, or by real estate mortgage or deed of trust, as agreed upon, it may provide a system for securing loans and deposits generally, in a particular way, or by providing an investment department in which certificates issued for loans and deposits are secured by the transfer to a trustee of notes, etc., to be held by the trustee solely for the benefit of depositors and others dealing in such bank, or agency of the bank, and the general creditors of the bank, as depositors and loaners not thus secured, will not be entitled to share in the securities, so transferred in trust, until those so secured are first paid.

6. SAME—*right of profits on deposits.* In the case of a stockholders' bank, carried on for their benefit, the profits on deposits belong to the stockholders, and not to the depositors. The depositor in such a bank is ordinarily but a creditor of the bank, entitled to recover from it his deposit, with interest, as by contract, express or implied, his deposit may have earned.

7. SAME—*nature of deposit.* The rule is, a deposit is general, unless the depositor makes it special, or deposits it expressly in some particular capacity; and where the deposit is general there is an implied undertaking on the part of the bank to return, not the same funds, but an equivalent sum whenever it shall be demanded.

8. SAME—*its name will not affect character of deposits.* Where a bank is, by its charter, a commercial bank belonging to its stockholders, and is managed for their profit, and the corporation is but a trustee for them in its management, the name it bears, as, that of a savings bank, in the absence of proof that the depositors were deceived and deluded thereby, is of no importance, and will not render its deposits in trust, so that the property in the money deposited will remain that of the depositor.

9. A circular of a stockholders' commercial bank, declaring that the capital stock of the bank constitutes a capital or safety fund, for the benefit of savings depositors, but which does not declare that the capital and stock of the bank belong to the savings depositors, and which does not even represent that the bank has a safety fund, falls far short of a declaration or creation of a trust, and has not the elements of an *estoppel in pais.*

10. Where a commercial bank has made an assignment in trust, for the benefit of a certain class of loans and deposits, under which it receives considerable sums of money, the holders of its certificates of indebtedness, made under such arrangement for security for their payment, will not be bound by any previous representations of the officers of the bank that the capital stock is a safety fund for the benefit of savings depositors, where it is not shown that they caused or encouraged them to be made, or even knew that they had been made, when they acquired their certificates, and still less where it is not shown that the savings depositors relied upon their truthfulness.

11. SAME—*by-law construed relating to deposits.* A by-law of a banking corporation having power, under its charter, to receive deposits, either as savings or in trust, that deposits of one dollar and upwards *may* be received from any person, etc., *to be held in trust for them,* does not show that all deposits were to be received in trust, but the reverse; and where the charter confers power to make such special regulations in reference to the trust funds, deposits or savings, as shall best aid depositors, it plainly shows that "trust funds," "deposits" and "savings" were regarded as separate and distinct, neither included within the other.

12. Where a deposit is made in trust it follows that any investment in public or other securities, by the bank, will also be in trust, but a by-law

declaring that all savings deposited, over and above such sums as it may be expedient to reserve for immediate use, should be invested in stocks and obligations of the United States, or of this State, etc., but which does not declare that such investments are to be made for the benefit of depositors, nor assume to give them any right to control or withdraw them on any contingency, will not render the investments trust property, and the bank may sell, assign, or pledge or mortgage them, in good faith, to secure other loans or deposits.

13. A by-law of a bank that deposits may be received and paid in gold or silver coin, or in such funds as may be current in the city where the bank is located, or as may be arranged by special agreement, made in writing by the president, etc., is a clear recognition that the deposits become debts of the bank, and authorizes the officers named to stipulate for payment without reference to the securities in which they may be invested.

14. So, a by-law authorizing a savings deposit to be withdrawn, after giving a certain notice, and this without regard to the condition of the investment at the time, indicates that the depositor has no trust in the investment. If he has a trust in it, he could not withdraw his deposit without regard to the investment, for, if loaned on note secured, he must await its maturity and collection or withdraw the note and security. So, an agreement to pay six per cent interest semi-annually on such deposits at all events, shows clearly that the deposits are not in trust.

15. SAME—*lien or trust in favor of depositors.* A promise by the officers of a bank to its savings depositors to keep and use the securities taken on loans or by way of investment for their benefit, can not be held to create a mortgage or pledge of such securities, nor as creating a trust. A lien in favor of a depositor can only be created by a mortgage or a pledge.

APPEAL from the Appellate Court for the First District.

George Chandler, as trustee for certain certificate holders, filed his bill in chancery in the circuit court of Cook county, against Samuel D. Ward, receiver of "The Merchants, Farmers and Mechanics' Savings Bank," to enjoin him from taking notes, mortgages, and securities, and mingling them with the general assets of the bank.

On the 16th of November, 1877, Chandler came into court and resigned his trusteeship, and thereupon Ward was appointed his successor in trust, and, as such trustee, was ordered to keep all the moneys and securities, delivered to him by Chandler, entirely separate and distinct from all other assets

and moneys in his hands, as receiver of said savings bank, and hold the same as a special and distinct fund for the payment of said certificates of investment, until there shall be a final adjudication as to whether said moneys and securities are to be applied specially to the payment of said certificates, or are to be treated as general assets of the bank, etc.

It was further ordered that the cause proceed against Ward in the name of S. J. Johnson, one of the investment certificate holders, who had joined in the bill filed by Chandler against Ward, and on behalf of all the other certificate holders.

Ward filed an answer and cross-bill, and subsequently leave was given, and an amended and supplemental bill was filed by Johnson and others, in behalf of all the investment certificate holders, against Ward.

The deed of trust recites the investment certificates. The deed is as follows:

"INVESTMENT DEPARTMENT.
"THE MERCHANTS, FARMERS AND MECHANICS' SAVINGS BANK, AND GEORGE CHANDLER, TRUSTEE.

"*Trust deed and declaration of trust:*

"This indenture, made and entered into this 23d day of December, A. D. 1873, by and between the Merchants, Farmers and Mechanics' Savings Bank of the city of Chicago, in the county of Cook, and State of Illinois, a corporation existing and doing business under and by virtue of an act of the General Assembly of the State of Illinois, party of the first part, and George Chandler, of the said city of Chicago, party of the second part, witnesseth:

"That the said party of the first part, in consideration of $1 to it in hand paid, has this day sold, transferred and set over, and does hereby sell, transfer and set over to the said party of the second part, all and singular the promissory notes secured by deeds of trust, conveying real estate situated in said city of Chicago, mentioned and described in the schedule hereto attached and made a part hereof; the said promissory notes being at this date held and owned by said party of the first part, the principal sums of said promissory notes

amounting, in the aggregate, to the sum of one hundred thousand dollars ($100,000); and also all the interest of the said party of the first part in and to the deeds of trust held by it as security for the payment of said promissory notes, said notes having been executed to said party of the first part as evidences of indebtedness to it, for the several sums of money therein mentioned, loaned by it to the makers thereof, and bearing interest at the rate of ten per cent per annum, payable semi-annually, and all being secured by deeds of trust, which are first liens upon improved real estate in said city of Chicago, greatly exceeding in value the several amounts of said notes—

"In trust, nevertheless, and for the following purposes, to-wit:

"Whereas, the said Merchants, Farmers and Mechanics' Savings Bank has, by a vote of its directors, adopted and organized an investment department as a part or branch of its business, for the purpose of furnishing to persons desiring to avail themselves of its benefits a higher rate of interest than is paid by savings banks upon savings deposits, and at the same time furnishing to such persons real estate or other security for the money to be invested by them, in the following manner, that is to say:

"The savings bank will receive in its said investment department all sums of money delivered to it for investment, of one hundred dollars ($100) and upward, and issue to the owners or investors thereof an investment certificate or certificates for the amount thereof, redeemable and convertible as hereinafter provided, upon presentation by the bearer to the trustee herein named; which said certificates shall bear interest at the rate which may be specified upon their face, which interest shall be payable quarterly; and the first series, entitled 'Series A,' of said certificates, shall bear interest at the rate of seven and thirty-hundredths ($7 \frac{30}{100}$) per cent per annum, and shall be substantially in form as follows, to-wit:

"Interest two cents per day, payable on the 1st days of February, March, August and November.

"Series A.  A, No.  *Investment certificates.  Issued by the Merchants, Farmers and Mechanics' Savings Bank, under the provisions of its charter:*

"CHICAGO, Illinois.

"This is to certify that the Merchants, Farmers and Mechanics' Savings Bank of Chicago, Illinois, has received into its investment department $100, for which it has issued this investment certificate, and it guarantees payment to the bearer hereof interest, from date, upon said sum, at the rate of $7\frac{3}{10}$ per cent per annum, payable quarterly on 1st days of February, May, August and November, upon presentation of this certificate to the trustee by whom it is countersigned. This certificate is exchangeable or redeemable upon its presentation by the holder to said trustee, together with like certificates, in sums amounting, in the aggregate, to $500 or more, by the transfer to the holder of a note or notes, or obligations, secured by deeds of trust, constituting first liens upon improved real estate in the city of Chicago, and State of Illinois, and described in the following mentioned deed and declaration of trust, or by payment by the trustee in current funds, at his option; and when the holder of this certificate desires redemption in currency, he may file the same with the trustee, who shall give him a proper receipt therefor, and pay the amount due thereon, in the order of presentation, out of the funds then in his hands, or which may next come to his hands from the collection of the notes and securities pledged for the redemption hereof; and when such holder is notified by the trustee that he is ready to redeem the same, interest upon this certificate shall cease.

"This certificate is one of series A, of like tenor and effect, to secure the redemption or payment of which the said bank has transferred unto the trustee countersigning this certificate, notes or obligations whose principal sums exceed, in the aggregate, the amount of said certificates, which notes yield interest

at the rate of ten per cent per annum, and are secured by said
deeds of trust; and said bank has executed to said trustee
a deed and declaration of trust insuring such redemption,
which, together with the deeds of trust therein described,
have been duly recorded in Cook county, Illinois. In making
such redemption, said secured notes shall be estimated at par,
with accrued interest. This certificate will be received at par,
with accrued interest, on account of any notes due to said
bank.

"*In witness whereof*, The Merchants, Farmers and Me-
chanics' Savings Bank has caused the certificate to be exe-
cuted, this —— day of ——, A. D. 187—.

"Entered.

—————————, Teller —————————.

"Entered and countersigned.

—————————, Trustee."

Across the face of the certificate, printed in red ink, is the
following:

"Secured by collaterals held in trust, which may be exam-
ined by the holder hereof on application to the trustee.

"The value of the real estate securing this series is about
$300 for every $100 of certificates.

"Secured by bonds and first mortgages on improved and
productive real estate.

"$100.

"And said certificates shall all be countersigned before
issue by said trustee and entered in a book to be kept for that
purpose, and shall be redeemable at the pleasure of the holder,
upon presentation in sums of not less than five hundred dol-
lars ($500) to the trustee herein, at his office in Chicago, by
the transfer by him to the said holder of one or more of the
promissory notes hereby transferred, or which may hereafter
be transferred to him, as herein provided, which shall be
equal in the amount of the principal and accrued interest to
the sum of the principal and accrued interest of such certifi-
cates, according to the conditions of said certificates and

indorsements thereon, as above set forth, or, at the option of said trustee, he may pay the amount due upon said certificates in lawful money of the United States or current funds in redemption thereof.

"Now, therefore, for the purpose of carrying into effect and operation the said investment department of said savings bank, and to furnish the necessary security for such certificates, and to insure their redemption according to their terms, and in accordance with a vote of the board of directors of said savings bank appointing said party of the second part trustee for the purpose aforesaid, this transfer of said promissory notes and securities is made, and for no other purpose whatever."

The duties and powers of said trustee shall be as follows, to-wit:

"*First.* He shall receive and faithfully keep all of said notes and securities so transferred or which may hereafter be transferred to him for the purposes aforesaid.

"*Second.* He shall receive and safely keep all other promissory notes or other evidences of indebtedness or securities which may hereafter be transferred to him by said party of the first part, in pursuance of the covenants and agreements of this deed of trust, for the security and redemption of said certificates, and shall use them in the same manner and with like effect as if they were specifically mentioned in said schedule hereto attached.

"*Third.* All of said certificates shall be countersigned by said trustee, and he shall countersign no more of them in amount than shall be authorized by the board of directors of said party of the first part, and no more in amount than the amount in the aggregate of the principal sums of the promissory notes or other interest-bearing securities then in his hands, transferred to him by said party of the first part, in pursuance of the provisions of this instrument.

"*Fourth.* Upon the presentation to him of any one or more of said certificates, amounting in the aggregate of the

principal sum thereof to the sum of five hundred dollars ($500) or more (or less, if he has securities of denomination sufficiently small to redeem the same), by transferring or assigning to the holder thereof some one or more of the promissory notes or other secured evidences of indebtedness hereby transferred, or which may hereafter be transferred to him for that purpose, which shall, as nearly as may be, equal in principal and accrued interest the amount of the principal and accrued interest of said certificates so to be redeemed; and if he have no note or notes or other evidences of indebtedness, which shall in principal and accrued interest exactly equal the amount of the principal and interest of such certificates, then he shall equalize the amount by delivering to the holder of said certificates other like certificates for the balance, or, at his option, by paying said balance in current funds; or, in case the note or notes, or other evidences of indebtedness, shall exceed in amount the principal and accrued interest of such certificate or certificates to be redeemed, the holders of the same shall pay to said trustee the balance or difference in other like certificates or in current funds, or the said trustee may, at his option, redeem said certificates by the payment to the holders thereof of the amount of the principal and accrued interest thereon in current funds.

"*Fifth.* Whenever any holder of any of said certificates may wish to have the same redeemed in cash, he may file the same for such purpose with said trustee, who shall give a proper receipt therefor, and thereupon the said trustee shall enter the same in a book to be kept for that purpose, with the date of presentation, and shall redeem and pay the same in current funds out of the first money which may come into his hands from the payment or collection of any of the promissory notes or securities in his hands, such redemption or payment being made by him of such certificates in the order in which they shall have been presented to him; and any holder of any of said certificates may, at his option, file the same with the trustee for registry, and said trustee shall register

such certificates in a book to be kept for that purpose, and deliver to such holder a certificate of the receipt and registry thereof, and retain such certificates on file in his possession; and he shall thereupon remit the quarterly interest due thereon, if requested, to such owners, and indorse the payment thereof upon such certificates.

"*Sixth.* The said trustee shall collect the interest as it may become due upon the notes and evidences of indebtedness in his hands, and retain a sufficient amount thereof to pay the interest next coming due upon all of the outstanding certificates, and out of the same or any money that may come to his hands for that purpose, he shall pay the interest due upon said certificates, as before provided; and said party of the first part covenants and agrees that it will keep the said trustee supplied with a sufficient amount of current funds to pay all the interest upon all the outstanding certificates when due.

"*Seventh.* In case any of the notes or other evidences of indebtedness may become due and payable in the hands of said trustee, then he may, at his option, either proceed to collect the same and enforce payment thereof by converting the securities, or by any proceedings in his own name, at law or in equity, and apply the proceeds to the redemption of any of said certificates which may have been entered for cash payment, or he may return and retransfer the same to said party of the first part upon receiving in place thereof other notes and securities of equal value. Whenever any of said notes or securities shall be so collected by said trustee, he shall pay over to said bank such portion of the proceeds as may not be required by him for the payment of interest, or of such certificates entered for payment.

"*Eighth.* Said trustee shall keep a book or books in which he shall keep a correct and complete record of all the said certificates countersigned by him, and a correct and complete record of all the promissory notes or other securities so transferred to him, and held by him for the redemption of such

certificates; and, also, a record of all certificates redeemed by him, which certificates, when redeemed, shall be canceled by him; and, also, a correct record of all notes, bonds and securities assigned and delivered by him in redemption of such certificates, which records shall, at all times in office hours, be open for the inspection of any of the directors, officers, agents, or attorneys of said party of the first part, and also for the inspection of any holder or holders of any of said certificates.

"And the said party of the first part covenants and agrees that whenever the said trustee shall assign to any holder or holders of any of said certificates, any one or more of said promissory notes or securities for the redemption thereof, then the said party of the first part shall transfer to said trustee other notes, bonds or securities sufficient in amount to replace the notes or securities so used by him for such redemption, so that the aggregate amount of the principal sums of the interest bearing and secured notes, or other securities in the hands of such trustee, shall never fall below the aggregate amount of the principal sums of all the said certificates outstanding and unredeemed, issued by the said party of the first part as above provided.

"And it is further provided, that said certificates shall be received by said savings bank in payment of any promissory notes due to it, and said trustee shall also receive them in payment of any of the notes or other evidences of indebtedness in his hands as aforesaid.

"And the said party of the second part, trustee as aforesaid, hereby accepts the trust imposed upon him by this instrument, and covenants and agrees to faithfully perform the duties of such trustee herein above specified, and that he will not countersign any more in amount of the certificates above mentioned than authorized by the board of directors of said savings bank, and no more in amount than the principal sums of the promissory notes or other evidences of indebtedness at such time in his hands, transferred to him in pursuance of the

trust hereby created, and that he will always keep in his hands an amount of such secured notes or other evidences of indebtedness at least equal to the amount of all outstanding certificates countersigned by him; and that he will redeem said certificates in the manner above, upon presentation to him as above provided; and upon his resignation or removal as such trustee, he will transfer to his successor in trust, appointed as herein provided, all the notes, bonds, or other securities, and all the money then in his hands transferred, to be received by him under or in pursuance of this trust, and account therefor to said bank; and at the expiration of this trust, and when all the certificates issued and countersigned by the trustee, or any successor in trust, have been redeemed and canceled, the said trustee or successor in trust shall transfer and deliver up to the said party of the first part all the notes or other evidences of indebtedness and securities which shall have been transferred to him by said party of the first part, then in his hands; and also all the money or funds belonging to said party of the first part then in his hands, and account generally to said party of the first part for all such notes, evidences of indebtedness, and securities, and for all moneys coming to his hands in and about the execution of this trust.

"In case of the death, resignation or inability to act of said trustee, then a new trustee or successor in trust shall be appointed by the board of directors of said party of the first part, who shall succeed to all the duties of the trustee herein named, and shall have all the powers conferred by this instrument upon said trustee; and said board of directors shall have the power, which is hereby reserved, to remove the said trustee or any successor, and appoint in his place a successor in trust, at their discretion.

"In witness whereof the said party of the first part has caused this instrument to be executed by its president and its cashier, and its corporate seal to be affixed hereto, and the

party of the second part has affixed his hand and seal the day and year aforesaid.

> "P. R. WESTFALL, *President.*
> "SIDNEY MYERS, *Cashier.*
> "GEORGE CHANDLER."
>
> [SEAL.]

The deed of trust was acknowledged and recorded.

Ward claims that the proceeds belong to and ought to be distributed to all the creditors of said bank alike; and asserts that the deed of trust is void.

Swen J. Johnson says that on the 6th day of March, 1876, he loaned and paid to the said bank the sum of $400, and received from such bank a certificate dated on that day, marked series A, and numbered R. 236, with the terms and conditions of the certificate set forth in said trust deed; and took the same, relying upon the provisions of said trust deed, and the notes and mortgages in the hands of the trustee, without any notice of any want of power in said bank to borrow or receive the money, on the pledge of said notes and mortgages; and says that prior to that day he had no dealings with said bank, and no part of the said sum of $400 had been deposited in said bank; that he did not know what the by-laws of said bank were, and had no information as to what formed the consideration of the notes held by the trustee; and says that no part of the principal or interest of said certificate has been paid.

L. W. Freeman says that on the 13th day of March, 1877, he loaned and paid to said bank the sum of $850, and received one of said certificates; and afterwards, on the 9th day of July, 1877, surrendered said certificate to the bank, and received therefor $450 in money and another similar certificate, dated on that day, marked series B. R. No. 95, for $400, which he now holds, and says that no part of said money was ever deposited in said bank, except as he paid it in for the first certificate. Same averment as to notice.

James P. O'Connor says that on the first day of November, 1874, said bank issued and delivered to him one of said certificates for $400, marked R. No. 55; on the 5th day of January, 1875, said bank issued and delivered another for $600, marked series A. R. No. 53; on the 29th day of March, 1875, said bank issued and delivered another for $200, marked R. No. 31; and on the 12th day of April, 1875, said bank issued and delivered another for $100, marked R. No. 84; same averment denying notice; and says that he had a deposit account in said bank, and a pass-book in which was entered each deposit and payment; and on such deposits the bank agreed to pay interest at the rate of six per cent per annum on balances, on the first days of January and July, according to the by-laws; and he also, at the time of opening said account, signed a signature book and assented to such by-laws, and at the time of the issue of each of the certificates to him receipted for the amount of money for which the certificate was issued, and the payment was entered in his pass-book, and thereupon the said bank issued and delivered the certificate.

Richard Fisher says that prior to the 26th day of July, 1876, he opened an account with said bank, and made deposits; and when he opened the account he signed a signature book, and assented thereby to the by-laws of said bank in regard to savings deposits, and received a pass-book containing a part of such by-laws, in which each deposit and each payment was entered; on July 31, 1876, he receipted to said bank for $100, and payment thereof was entered in the pass-book, and at his request said bank issued and delivered to him one of said certificates, dated on that day, marked series B. R. No. 29, for $100. Same averment denying notice.

Robert W. Smith says that Ralph A. Tenney, on the 3d day of September, 1877, assigned and delivered, as collateral security, to him three of said certificates, each $100, dated in October, 1876, marked respectively series B. Nos. 46, 50 and 51. Averment denying notice.

The bill alleges that in September and October, 1877, the said certificates were filed with said trustee for redemption.

The bill prays "that Ward, receiver of said bank, and trustee for said bank, and holder of said certificates, be made defendant to the amended and supplemental bill of complaint, and required to answer; that on a final hearing the said Ward be required to collect all of the notes received by him, as trustee, from said Chandler, and use the proceeds, together with the money received from Chandler, for the payment of the necessary expenses of the trust, and to use the balance for the payment of the certificates held by all holders of said certificates, *pro rata*, as he may have funds, until the whole shall be paid; and that meanwhile the said Ward be restrained from using any of the money received from the said Chandler, or collected on the notes or mortgages for the payment of the savings depositors."

On the first hearing of the cause, the circuit court, among other things, found "that the notes, securities and assets traced to and found in the hands of and held by George Chandler," purporting to be transferred to and held by him under and by virtue of the trust deed, "were all originally purchased by and with, substantially, the funds supplied by, derived from and actually taken out of the savings deposit fund, arising from the several deposits made by original savings deposit customers of said bank, under its charter and by-laws, to which by-laws such savings depositors were required to and did assent; and that under said charter and by-laws all of said savings deposits made by said several depositors in said bank, a trust was confided in each and every case of such deposit in said bank under said charter and by-laws"; and it was decreed that the original and amended supplemental bills be dismissed for want of equity, and that said trust deed be set aside, and be held null and void as against the savings depositors of said bank.

From this decree the present appellees appealed to the Appellate Court for the First District, and, upon hearing in

that court, the decree of the circuit court was reversed and the cause remanded for further proceedings.

Upon the second hearing in the circuit court the following decree was rendered:

This cause having been heretofore reversed and remanded by the Appellate Court, and now coming on again to be heard upon the pleadings and proofs, in pursuance of the judgment and opinion of the Appellate Court, and the court being now sufficiently advised, by such judgment and opinion, and otherwise, in the premises, finds that on the 23d day of December, A. D. 1873, the said Merchants, Farmers and Mechanics' Savings Bank was the holder and owner of certain promissory notes which were secured by deeds of trust conveying real estate, and that such notes were given for money belonging to and loaned by said bank in the transaction of its business; and that on said last named day said bank assigned said notes by indorsement to said George Chandler, trustee, and executed to him the deed of trust set out in the amended and supplemental bill of complaint, and that said deed of trust was valid and binding upon said bank, and is still so valid and binding, and that the same and the assignment of said notes and securities created a trust for the purposes in said deed of trust specified, which is still a valid and subsisting trust; and the court further finds that the relation between said bank and its savings depositors was that of debtor and creditor, and that the funds arising from the savings deposits were the absolute property of the bank, and the said bank had full power to negotiate or pledge its securities obtained by loaning said funds; and the court further finds that all of the notes in the hands of said George Chandler, on the 19th day of September, A. D. 1877, and which had been assigned to him as trustee, by said bank, were so held in trust for the use and benefit of all of the holders of the certificates of investment described in the bill, according to the terms set forth in said deed of trust, and that all of said notes and securities assigned, and moneys turned over by said Chandler,

trustee, to Samuel D. Ward, trustee, appointed by this court in place of and successor to said Chandler, upon the resignation of said Chandler as such trustee, and the proceeds thereof, are now held in trust by said Ward, as such trustee, for the use and benefit of all of the holders of said certificates of investment, according to the terms and provisions of said deed of trust.

It is therefore ordered, adjudged and decreed that the said Samuel D. Ward, trustee as aforesaid, or his successors in trust, proceed to execute and carry out the trust created by said deed of trust, according to the terms thereof, and use the moneys received by him from said Chandler, and the proceeds of the notes and securities transferred to him by said Chandler, first, for the payment of the necessary expenses of said trust, and to use the balance for the payment of all of said certificates of investment outstanding *pro rata*, from time to time, as he may have funds, until all of said outstanding certificates shall have been paid in full, or until the whole of said fund shall be exhausted, and to pay the balance, if any, unto the receiver of said bank.

It is further ordered, adjudged and decreed that the said Samuel D. Ward, trustee, and his successors in trust, be perpetually enjoined and restrained from using any of the money received by him from said Chandler, or collected by him, proceeds of the notes and securities received by him from the said George Chandler, for the payment of any debts due the savings depositors or other creditors of said bank, or for the payment of any expenses of the receiver of said bank, until the whole amount due on all of said outstanding certificates shall be paid.

Order relating to solicitor's fees.

And it is further ordered and decreed that the said Samuel D. Ward, receiver, deliver up and transfer to himself, as such trustee, or to his successors in trust, all deeds of trust securing any of said notes, abstracts of title to the lots or lands described in said deeds of trust, or any of them, and all policies

of insurance and other papers or documents of any and every kind in his hands concerning or belonging to said securities.

From this decree Ward appealed to the Appellate Court for the First District, where, on final hearing, the decree of the circuit court was affirmed. From that decree he appeals to this court, and assigns the following errors:

1. The court erred in making and entering the decree in this case.

2. The decree and the order of affirmance of the courts below are erroneous, because inequitable.

3. There was no authority in the corporation, after accepting deposits *in trust* to be used for the depositors, to make any trustee or turn over the securities purchased with the funds of the depositors, who, under the by-laws, were to be treated as *cestuis que trust.*

4. The whole proceeding with the funds of depositors, in relation to said securities, was illegal and void.

5. The courts have entirely overlooked, in their decree and order of affirmance, the fact that there was a by-law equivalent to a special agreement with each depositor to receive his deposits in trust, and treat him as a beneficiary of the trust fund upon the conditions specified; and hence the fund was wrongfully converted and misapplied by the corporation, of which the certificate holders had notice; and therefore the whole decree, on giving the latter a preference, is illegal and void, and the order affirming the same is erroneous.

6. The decree should have decreed a lien in favor of the general depositors, instead of the certificate holders, because, in point of time as well as priority, the general creditors furnished the funds to purchase the securities turned over to the trustee for the use of the certificate holders.

7. The decree and the order affirming the same are contrary to the law and the evidence of the case, and should be reversed.

8. The Appellate Court erred in affirming the decree of the circuit court.

Messrs. HOYNE, HORTON & HOYNE, for the appellant:

The case, as we understand it, turns not upon the technical character of the corporation as a bank, but upon what it actually did in this case.

On the back pages of every depositor's book there is printed in a three page circular that the stock and capital of the bank constitute a capital or safety fund for the benefit of savings depositors, and this clause:

" In one feature, however, it (the bank) differs from most *savings banks* now in operation, inasmuch as it has a *capital*, and a provision for a gradually increasing *safety fund*, to which all its earnings over and above a certain percentage are to be applied, until said fund shall equal the whole amount of capital stock, which, by the charter, may be increased to $500,000."

Upon this we urge that the doctrine of estoppel applies. The charter itself authorizes the corporation to make rules for receiving and accepting such trusts, and it makes accordingly such by-laws as clearly demonstrate the understanding and faith upon which the parties acted.

Trusts may be express, but the greatest number of trusts arise by implication of law out of the relation of confidence that exists between parties. The receiving of money which, consistently with conscience, can not be retained, is, in equity, sufficient to raise a trust in favor of the party for whom or on whose account it was received. Story's Eq. Juris. sec. 1, 255.

Where equities are in other respects equal, precedency in time will, under many circumstances, give an advantage or priority in right. Hence, where the legal estate is outstanding, equitable incumbrances must be paid according to priority of time, and whenever equities are unequal, then the preference is constantly given to the superior equity. 1 Story's Eq. Juris. sec 64, d.

We come now to the doctrine of conversion in equity, or

the right of the *cestui que trust* to follow the trust fund or property, whatever changes it may have undergone, whenever it can be traced or followed. 1 Lead. Cas. in Eq. 277; *Pennell* v. *Defell*, 4 DeGex, McNaughton & Gordon, 388; 1 Story's Eq. Juris. secs. 121, 1211, 1258; *Sheldon* v. *Harding*, 44 Ill. 68; *Whiteside* v. *Warner*, 20 Vt. 425; *Moses* v. *Murgatroyd*, 1 Johns. Ch. 119; *Bottsford* v. *Burr*, 2 id. 405; *Wray* v. *Steele*, 2 Ves. & Beams, 388; 16 N. J. Eq. 70; *School Trustees* v. *Kerwin*, 25 Ill. 76; *Norton* v. *Hixon*, 25 id. 441; Adams' Eq. 112.

When, therefore, this bank transferred these securities, in which the fund of depositors was invested for their use and benefit, it committed a fraud or wrong, the only remedy for which a court of equity can supply. *Davoners* v. *Fanning*, 2 Johns. Ch. 251; *Hood* v. *Warner*, 5 Paige, 655; *Michmond* v. *Girod*, 4 How. 553; Paley on Principal and Agent, 51.

Messrs. GOUDY, CHANDLER & SKINNER, for the appellees, after referring to various provisions in the charter of the bank and its by-laws, and stating the facts, etc., made the following points, among others:

1. The certificates and deed of trust forming the contract are valid, and the bank had power to assign the notes to the trustee. The general power residing in a bank to receive deposits, invest the money, discount bills, etc., implies the power to borrow money. *Curtis* v. *Leavitt*, 15 N. Y. 51–56; *Planters' Bank* v. *Sharp*, 6 How. 323; Brice on Ultra Vires, 122.

A bank authorized to take negotiable paper can assign and transfer it. *McIntire* v. *Preston*, 5 Gilm. 48; *Planters' Bank* v. *Sharp*, 6 How. 323.

2. The contract is valid even if the notes and mortgages transferred were held by the bank in trust for savings depositors. But the notes secured by mortgages so transferred were not held in trust. There is nothing in the charter to indicate that money deposited for savings was received in trust in a

manner to constitute the bank a trustee and the depositors *cestuis que trust.*

This corporation being a bank, then the relation between the depositor and the bank was that of creditor and debtor, and the money deposited was a loan to the bank. Morse on Banking, 25, 26; *Tinkham* v. *Hayworth,* 31 Ill. 519; *Marine Bank* v. *Fulton Bank,* 2 Wall. 252; *Thompson* v. *Riggs,* 5 Wall. 658; *Ketcham* v. *Bank of Commerce,* 18 N. Y. 513; *Chapman* v. *White,* 6 N. Y. 412; *Franklin Bank,* 1 Paige, 249.

3. Appellant being the trustee under the deed of trust made by the bank to Chandler, is estopped from denying its validity.

Mr. ELLIOTT ANTHONY, also for the appellees, after stating the facts of the case and the state of the pleadings, made the following, among other points:

This corporation was a bank, and because it bears the name of "savings," does not make it a savings bank. Where a depositor goes to a bank and deposits his money, he parts with all control over it. It is no longer his money, and the only relation established between him and the bank is that of creditor and debtor.

Funds of a depositor in a bank are not trust funds. *Foley* v. *Hill,* 2 House of Lords Cases, 39; *Brahm* v. *Adkins,* 77 Ill. 264; *Tinkham & Co.* v. *Heyworth,* 31 id. 519; *Marine Bank* v. *Chandler,* 27 id. 525; *Marine Bank* v. *Rushman,* 28 id. 463; *Ketcham* v. *Bank of Commerce,* 19 N. Y. 519; *Curtis* v. *Lovitt,* 15 N. Y. 52; *Chapman* v. *White,* 6 N. Y. 417; Morse on Banking (2 ed.) 28–30.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The principal question arising upon this record is, did "The Merchants, Farmers and Mechanics' Savings Bank" have power to borrow money and issue "investment certificates" therefor, secured by trust deed, as was here done?

Sections 3, 4, 5 and 6 of the charter of "The Merchants, Farmers and Mechanics' Savings Bank" are as follows:

"Sec. 3. The said corporation shall be authorized to receive money from any person or persons who may wish to deposit the same. Married women and minors may, in their own names, deposit money with said corporation, and receive certificates of deposit in their own names, and which deposits shall be subject to their order only. All deposits of money shall be used and improved in a manner not inconsistent with the laws of this State, and any rate of interest not exceeding that allowed by law shall be paid for such deposits.

"Sec. 4. The said corporation may accept and execute all such trusts, whether fiduciary or otherwise, as shall or may be committed to it by any person or persons or by the order of any court or tribunal in the State of Illinois; may make such special regulations in reference to trust funds, deposits or savings as shall best aid the depositors and parties interested, by accumulating and increasing the same, allowing and receiving such rate of interest therefor, not greater than hereinbefore mentioned, as may be agreed upon; may grant and purchase annuities, issue letters of credit and other commercial obligations: *Provided*, the same shall not be in the similitude of bank notes or other evidences of debt designed to circulate as money. The said corporation shall have power to loan money, to receive money on deposit and pay interest therefor, and to loan money at any rate of interest not exceeding ten per cent per annum, or to discount, in accordance with bank usage; and in the computation of time, thirty days shall be a month, and twelve months a year; and take such security as the directors may see proper; may take stock in other corporations; may buy and sell exchange, bills, notes, bonds and other securities, and may have and hold coin and bullion.

"Sec. 5. The business of said corporation shall be conducted by the directors, and in such manner as they may direct. Three of the directors, one of whom shall be the president or

cashier, shall be a quorum to transact any business of the board of directors, and such as are usual in such corporations.

"Sec. 6. The said corporation shall have power to purchase and hold all such real and personal estate as may be convenient for the transaction of its business; to take and hold any real estate as security for and in payment of loans and debts due and to become due to said corporation, and to purchase any real or personal estate at any sale to enforce its securities on the payment of debts due, made by virtue of any process, mortgage, or deed of trust, and to hold said property, or to sell and convey the same, or any part thereof, at such price and under such conditions as the directors or officers may think proper."

Thus, it will be seen, express power is given to receive money on deposit; to receive and execute trusts committed to the corporation by any person or persons or by order of any court in this State; to grant and purchase annuities; to issue letters of credit and other commercial obligations other than notes designed to circulate as money; to loan money; to receive money on deposit and pay interest therefor; to discount according to bank usage; to take stock in other corporations; to buy and sell exchange, bills, notes, bonds and other securities; to have and to hold coin and bullion; to take and hold real estate as security for and in payment of loans and debts due or to become due to the corporation; to purchase and hold real and personal property at any sale, to enforce its securities or debts due; to hold said property and sell and convey the same; and to purchase and hold such real and personal estate as may be convenient for the transaction of its business. Special power is also given to receive deposits from married women and minors, and to issue therefor certificates payable in their names, and payable to their order only; and to pay and receive any rate of interest not exceeding ten per cent, and to make special regulations in regard to trust funds, deposits or savings.

In addition to these express powers there can be no doubt

that such corporations possess, also, the implied power to borrow money. Morse on Banks and Banking, 4; *Planter's Bank* v. *Sharp*, 6 Howard (U. S.) 323; *Curtis* v. *Leavitt*, 15 N. Y. 52–3; Brice on Ultra Vires, 122 (Seward's Ed. 109).

It will not, therefore, be important to determine whether the certificate holders, claiming under the trust deed, are to be regarded as having made deposits or loans for which their certificates were obtained, for in the one case the requisite power is expressly given to the corporation by its charter, and in the other case it possesses the power by necessary implication. Nor can the right of the corporation to assign or mortgage negotiable instruments which it is authorized to take be questioned. *McIntire* v. *Preston*, 5 Gilm. 48; *Planters' Bank* v. *Sharp, supra.*

The result of the authorities is concisely stated by Daniels, in his work on "Negotiable Instruments," vol. 1, p. 287, § 382, thus: "In this country three propositions respecting private corporations may be regarded as settled: *First,* That it (the corporation,) has implied power to contract debts like an individual, whenever necessary or convenient in furtherance of its legitimate objects. *Second,* That whenever it may contract a debt it may borrow money to pay it. And, *Third,* That whenever it contracts a debt for materials, services, or otherwise, in the scope of its business, or borrows money, it may execute a negotiable bill, note or bond, and secure it by mortgage to the creditor in payment." See, also, authorities cited in note.

The creation of the "investment department" was not the creation of a new corporation or new agency. It was merely giving a name to a branch of business clearly within the corporate power, and indicating the system that would be pursued in its transaction. The corporation was authorized to contract and agree with persons desiring to make deposits or loan money as to the terms. It might execute its bond, note or certificate as evidence of the indebtedness, and secure the same by pledge or chattel mortgage, or note, securities, etc.,

or by real estate mortgage or trust deed, just as should be mutually agreed. And there has been no reason suggested, and we can conceive of none, why providing a system for securing loans and deposits generally in a particular way is objectionable, when it would not be objectionable to conduct a single transaction in that way. The business is simply that of the bank obtaining money, and so far as the public was concerned, presumably needed in its business, and securing it by a trust deed upon terms mutually satisfactory to the respective parties in interest. The name is not of the slightest consequence. The transaction itself, individually considered, is neither unusual nor extraordinary.

The bill alleges that on the 23d day of December, 1873, the bank was the holder and owner of certain promissory notes which were secured by mortgages and deeds of trust on real estate, and such notes were given for money belonging to said bank; and on the last named day the said bank assigned said notes to George Chandler, as trustee, and executed to him a deed of trust, being that involved in the present controversy, and which is there set out *in hæc verba.*

It is afterwards further alleged that there were four directors of the bank,—two were president and cashier and stockholders, and the other two were not stockholders; that after the deed of trust had been executed and the notes and securities assigned to Chandler, various persons loaned and paid to the bank various sums of money, and received therefor investment certificates at par, bearing interest at the rate of $7\frac{3}{10}$ per cent per annum, payable quarterly; and that the said bank mixed such money with its other funds, and used the same to pay depositors, to purchase bonds, stocks, exchange, and loaned on real estate security, and in all the modes usual among bankers; and many of said certificates were paid or redeemed according to the terms thereof, and others in like manner issued for other money paid and loaned to the bank, so that at the time of the suspension of business there were outstanding certificates to the amount of $93,300.

The answer states "that defendant has no personal knowledge as to how many persons were acting as directors at the time of the execution of the deed of trust, but admits that the four persons signed the records, and that the records show that on the 23d day of December, 1873, a quorum being present, the following preamble and resolutions were adopted." Then follow the preamble reciting reasons for assigning the notes and executing the deed of trust to Chandler, and resolutions directing the same to be done. After which, the answer admits that after the deed of trust had been executed and delivered, various persons received investment certificates bearing interest at $7\frac{3}{10}$ per centum per annum, payable quarterly, and that many of the certificates so issued were paid or redeemed and others issued; and that at the time of the suspension of the bank there were outstanding investment certificates to the amount, in the aggregate, of $93,300.

The proof shows that the money for which the certificates of investment were issued went into the general business of the bank, and was used for paying everything for which the bank used money.

The contract, therefore, having been in good faith performed by the certificate holders, and the bank having had the full benefit of the contract, it is not allowed to interpose the defence of *ultra vires*.   *Darst* v. *Gale*, 83 Ill. 141; *Ex parte Chippendale*, D. G. M. & G. 19; *Bradley* v. *Ballard*, 55 Ill. 413; *West* v. *Madison County Agricultural Board*, 82 id. 206; *Maher* v. *Chicago*, 38 id. 266; *Railway Co.* v. *McCarthy*, 96 U. S. 267; *San Antonio* v. *McChoffy*, id. 315; *Hitchcock* v. *Galveston*, id. 351; *Morris Railroad Co.* v. *Railroad Co.* 29 N. J. Eq. 452; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62.

But the question here is not solely between the bank on the one side and depositors or loaners of money on the other. It is between depositors or loaners of money for investment certificates secured by the deed of trust, and depositors or loaners of money who are not thus secured, as well as the bank. Such depositors or loaners of money, it is argued on behalf of

appellant, are entitled to come in and share equally in the security afforded by the trust deed, because the notes, bonds, etc., held by the trustee, under the deed of trust, were trust property held by the bank for its depositors, etc., generally, which could not hence be pledged to any individual or class of individual creditors of the bank.

The charter of the Merchants, Farmers and Mechanics' Savings Bank provides for a capital stock of $50,000, with power to increase to $500,000, divided into shares of $50 each. The bank is a stockholders' bank, controlled and operated under the direction of a board of directors, for the benefit of the shareholders. It is, therefore, totally dissimilar to "savings banks," as defined by Grant in his treatise on the Law Relating to Bankers and Banking, 425, * 614. Such banks, he says, derive no benefit whatever from any deposit or the produce thereof. The corporation may receive on deposit, for the use and benefit of the depositors, all sums of money offered for that purpose, and invest the same, etc., but the increase or interest of all deposits shall be divided among the depositors or their legal representatives, etc. See also, *Huntington* v. *Savings Bank*, 96 U. S. (6 Otto), 388. The bank there is clearly but the agent or trustee of the depositor, and any appropriation of the deposit to a purpose other than that for which it was intended would be a perversion of the trust, and it might, at the election of the depositor, be followed and reclaimed wherever it could be distinctly identified.

But in a stockholders' bank the property belongs to the stockholders. The bank is carried on for their benefit. The profits belong to them, and, ordinarily, the depositor is but a creditor entitled to recover from the bank his deposit, with such interest as by contract, express or implied, his deposit may have earned. Morse on Banking, 25, 26; *Tinkham* v. *Heyworth*, 31 Ill. 519.

The rule is, a deposit is general unless the depositor makes it special, or deposits it expressly in some particular capacity, and, where the deposit is general, there is an implied under-

taking on the part of the bank to restore, not the same funds, but an equivalent sum, whenever it should be demanded. *Brahm et al.* v. *Adkins*, 77 Ill. 263.

But the position of the counsel for the appellant is, "it made no difference, as to the powers conferred or nature of the corporation, whether, in this case, the corporation was a savings bank or commercial bank," because, as they contend, "the corporation accepted the money of the depositors" whom they represent, "to be held specifically as trust money, and treated as such under any agreement."

There is no evidence, and no pretence that there is any, of a special contract whereby the bank in so many words expressly contracted to receive and hold in trust the money or property of the depositors whom the counsel represent. But the counsel contend that such a contract is to be inferred from the charter and by-laws of the bank and the making of the deposit and accompanying circumstances. Reliance is especially placed on these facts. The bank calls itself a "savings bank." In every depositor's book there is printed a three page circular which expressly declares that in this case the stock and capital of the bank constitute a capital or safety fund for the benefit of savings depositors.

Article 6, section 2 of the by-laws provides "that all deposits received from any person or persons, including minors and married women, are to be held in trust for them, or for such person or persons as they may designate; also, from any court, society or corporation, through their proper officers, but no sum less than one dollar shall be withdrawn if the balance due exceeds that amount."

Section 7 of same article 6 requires "that all persons making deposit shall place their names on the signatnre book. Such book shall contain a copy of all by-laws and regulations of the institution which have reference to savings deposits or depositors, and every person signing said book shall be deemed to have assented thereto."

Article 8 requires the savings deposit to be invested in : " 1, Stocks and obligations of the United States; 2, Or of the State of Illinois; 3, Or in the evidences of indebtedness of the city of Chicago; 4, Or in bonds and mortgages on real estate of double the value of the amount loaned, clear of all incumbrances; 5, Or upon such securities as the board may direct, in accordance with the provisions of the charter, or such as are used by the oldest and most reliable savings banks in the United States."

Section 4 of the charter provides "that the corporation may accept and execute all such trusts, fiduciary or otherwise, as shall or may be committed to it by any person or persons, or by order of any court in Illinois, and may make such special regulations in reference to trust funds, deposits or savings as shall best aid the depositors, parties interested, by accumulating and increasing the same."

And section 5 of the charter provides " that the business of the institution shall be conducted and managed by the directors and officers, and not by third persons acting as trustees or otherwise."

Let the effect of these, as proofs from which to infer a contract that the deposits were made in trust, so that the property continued to be that of the depositors, be considered.

Since the position of counsel concedes that the bank was, in fact, a stockholders' commercial bank, and not a savings bank, in which the stockholders were the owners of the capital, and the corporation but a trustee for them in its management, it would seem the name, in the absence of proof that the depositors were deceived and deluded thereby, could be of no importance. The bank is not, in truth, what the name indicates, but unless harm has thereby resulted, the law attaches no consequence to that. With the charter and by-laws of the bank before the depositors, showing what the real character of the bank was, we are not authorized to assume, in the absence of proof, that they were misled and deceived by the name.

The circular, declaring that the capital and stock of the bank constitute a capital or safety fund for the benefit of savings depositors, does not declare that the capital and stock of the bank belong to the savings depositors, nor does it amount to a legal declaration of trust in that regard. The particular language of the circular to which reference is made is, doubtless, this: "In one feature, however, it differs from most savings banks now in operation, inasmuch as it has a capital, and a provision for a gradually increasing safety fund, to which all its earnings, over and above a certain percentage, are to be applied, until said fund shall equal the whole amount of the capital stock, which, by the charter, may be increased to $500,000." The capital here, it will be observed, is not represented as belonging to the depositors, but to the bank. Nor is it represented that this capital shall be used only for the payment of dues to savings depositors. Nor is it represented that the bank has, in fact, a safety fund, etc., but the representation is, simply, that the bank has a capital, and a *provision for* a gradually increasing safety fund, to which all its earnings, over and above a certain percentage, are to be applied, etc., etc.—that is to say, this *provision* requires that they shall be so applied. The substance is, in brief, a laudation, *ad captandum,* of the charter of the bank, and the system contemplated to be put in practice in carrying it on. It falls far short of the creation of a trust, and it does not have the elements of an *estoppel in pais.*

Apart from this consideration, however, upon what principle do appellees become bound by these representations of the bank? They were not parties to them. It is not shown that they caused or encouraged them to be made, nor that, when they became depositors, they knew that they had been made, still less that anybody had acted in reliance solely upon their truthfulness. Even, then, if they be conceded to be binding upon the bank, we do not think they could be binding upon appellees.

Article 6, section 2 of the by-laws is: "Deposits of $1 and upwards *may* be received by the officers of this institution, from any person or persons, including minors and married women, to be held in trust for them, or for such person or persons as *they* may designate; also, from any court, society or corporation, through their proper officers; but no sum less than $1 shall be withdrawn, if the balance due exceed that amount." This, instead of proving that *all* deposits were to be received in trust, proves directly the reverse. In the event they were to be thus received, this by-law would have been wholly unnecessary. But we have seen that, by section 4 of the charter, power is given to the corporation to "accept and execute all such trusts, whether fiduciary or otherwise, as shall or may be committed to it by any person or persons, or by the order of any court or tribunal in the State of Illinois," and this by-law is in strict conformity with that grant of power. It authorizes the officers of the bank to execute the power and accept the specified trusts.

Mr. Chambers, who was in the employ of the bank as book-keeper, shows what was done in conformity with this by-law, thus: "We received money on special trusts, and had a special book showing the conditions under which the account should be kept, and to whom paid. There were many cases of minors and societies. These special trusts were not entered on the depositors' book, but were entered on a book kept by the bank."

It does not appear that the counsel represent any who are affected by this by-law. It has, as will be observed, no reference whatever to savings deposits, but refers exclusively to deposits on special trust indicated by the depositor and agreed upon at the time of making the deposit.

Power to receive savings deposits, as has been seen, is conferred upon the corporation by section 3 of the charter, and section 4 thereof, in addition to conferring power to receive and execute trusts, also confers, besides other named powers, power "to receive money on deposit and pay interest there-

for "—thus showing that this could not have been contemplated as being within the prior granted power, in the same section, of receiving and executing trusts. And in the same section power is also conferred upon the corporation to make such special regulations in reference to trust funds, deposits or savings as shall best aid the depositors, etc., etc.—thus again plainly showing that "trust funds," "deposits" and "savings" were regarded as separate and distinct, and neither included within the other.

Much reliance is, seemingly, placed by counsel upon section 1, article 8 of the by-laws, as showing that the savings deposits were a trust. That section is as follows: "All savings deposited in this bank, over and above such sums as it may be expedient to reserve for immediate use, as provided in the charter and these by-laws, shall be invested in the stocks and obligations of the United States, or the State of Illinois, or in the evidences of indebtedness of the city of Chicago, or in bonds and mortgages on real estate in the city of Chicago, or upon real estate of double the value of the amount loaned, clear of all incumbrances, or upon such securities as the board of directors may select, in accordance with the provisions of the charter, or such as are used by the oldest and most reliable savings banks in the United States."

If it were conceded that all savings were deposited in trust, it would follow that the investments in these securities would also be in trust; but this section furnishes no proof that savings were to be deposited in trust. It does not declare that these investments are to be made for the benefit of depositors; nor assume to give them any right to control or withdraw them in any contingency whatever. If it were conceded that savings were not deposited in trust, it would then follow that these investments were to be made for the benefit of the bank, and the savings depositors would have precisely the same rights in regard to them that they would have in regard to any other promise of good management in regard to the affairs of the bank. But the investments being the

general property of the bank, the board of directors might authorize them to be sold, assigned, or pledged or mortgaged in good faith, to secure whatever loans or deposits they might deem it advisable to obtain. Since this section relates exclusively to the *investment* of the deposits, after they are made, we must look to other sections to determine the character of the deposits.

Without again recurring to what has been heretofore said in this regard, it will be sufficient to notice a few other sections of the by-laws.

Section 1 of article 6 of the by-laws provides that deposits may be received and paid in gold or silver coin, or in such funds as may be current in Chicago or as may be arranged by special agreement made in writing by the president, vice-president or cashier.

This is limited to no class of deposits, but is comprehensive enough to include all that may be made of every class. It, as clearly as language can, recognizes that the deposit becomes a debt of the bank, and authorizes the officers named to stipulate for its payment, without reference to the securities in which it may be invested.

Section 4 of the same article authorizes the savings deposit to be withdrawn, after giving a certain notice—and this without regard to the condition of the investment at the time. It is obvious, if the depositor has a trust in the investment, he can not withdraw his deposit without having regard to the condition of the investment, for if the money be loaned upon note not yet due, secured by real estate mortgage, he will have to await the maturity and collection of the note, or withdraw the note and mortgage, if they could be identified— neither of which is contemplated, but the payment of money only, as upon a debt due.

And again, article 7 provides for the payment of interest semi-annually at 6 per cent upon the savings deposits. And this contemplates the payment shall be made, at all events, whether money to that extent be realized on the securities in

which the deposits are invested or not. But if the investment were in trust for the benefit of the depositor, he would not be entitled to interest, at all events, but only to follow his money into the security in which it is invested, and take the security for what it is worth.

If it were conceded that, under all the circumstances, it should be held the bank promised to use these securities for the benefit of the savings depositors, it certainly could not be held that such promise created a mortgage or pledge, and we are aware of no principle upon which it could be held to create a trust. If, as we think is clear, the bank became the debtor of the savings depositor, and legally bound to pay him his deposit with accruing interest, at all events, he could only have become interested in the bonds, etc., in which his deposit was subsequently invested, as a security, collateral to the legal obligation of the bank to pay him his debt. If the bank paid him the security would be released,—and it could only be realized from by legal proceedings subjecting it to sale for the payment of his debt. But a lien of this kind, in our opinion, could only be created by a mortgage or a pledge.

We do not regard the by-law directing the investment of savings deposits otherwise than as binding upon the officers and members of the banking corporation alone. The general rule is, that the by-laws of a corporation are binding upon none but its members and officers. Angell & Ames on Corp. § 359.

We do not think, in any view, the proof shows that these certificate holders had such knowledge of the by-laws of this corporation as to be bound and concluded by them. They were, practically, strangers to the corporation, and could not hence be affected by any disobedience of its officers or directors to its by-laws, of whose contents they were ignorant. Their good faith is unquestioned by the proof, and they are entitled to the protection given them by the decree of the Appellate Court.

The decree is affirmed.          *Decree affirmed.*

SCOTT, J., dissenting.