No. 27,186.

J. M. HUSTON and F. G. HOOPER, *Appellants*, v. S. C. TOWER, and WILLIAM DOCKING, as Receiver, etc., *Appellees*.

SYLLABUS BY THE COURT.

BANKS AND BANKING—*Unlawful Preference—Delivery of Prior Agreed Security After Insolvency.* If a solvent bank borrows money to maintain its reserve under a verbal arrangement for the loan which provides for present security consisting of a specified note and mortgage carried in the bank's real-estate account, but the security remains in the bank for several months, the bank becomes insolvent, and the security is then delivered to the lender, delivery of the security does not constitute a preference forbidden by R. S. 9-142.

Appeal from Pottawatomie district court; MARTIN A. BENDER, judge. Opinion filed March 12, 1927. Judgment vacated, and cause remanded for further proceedings.

*A. E. Crane*, of Topeka, *E. S. Francis* and *E. C. Brookens*, both of Westmoreland, for the appellants.

*W. F. Challis*, of Wamego, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a promissory note and to foreclose a mortgage securing the note. The maker of the note and mortgage did not defend. The receiver of failed banks intervened, and claimed the note and mortgage belonged to the Belvue State Bank, that plaintiffs were simple creditors of the bank, and that the note and mortgage were delivered to them as security while the bank was insolvent, contrary to the statute forbidding preferences. Judgment was rendered for the receiver, and plaintiffs appeal.

The note was given by Tower to the Belvue State Bank, and was secured by a second mortgage. When plaintiffs obtained possession of the instruments, payments had reduced the principal to $2,000. Because the mortgage was a second mortgage, the securities were carried as real estate. In the real-estate account of the bank was an item of $3,000, known as the Aeggers assignment.

Hooper was president of the bank, Huston was vice president, and Child was cashier. In August, 1925, the bank needed funds to maintain its reserve, and the two real-estate items were offered to

Huston v. Tower.

the First National Bank of Wamego as security for a loan of
$5,000. The Wamego bank declined the offer, but expressed will-
ingness to lend the Belvue bank $5,000 on the personal notes of
Huston and Hooper for $2,500 each. Child, Huston and Hooper
testified they talked the matter over, and agreed that Huston and
Hooper would give their individual notes of $2,500 each to the
Wamego bank, the proceeds would go to the Belvue bank, and
Huston and Hooper would take the Tower and Aeggers items as
security. In execution of this arrangement, and on August 30, 1924,
Huston and Hooper each gave his note for $2,500 to the Wamego
bank, and the Wamego bank gave the Belvue bank credit for $5,000.
As a matter of bookkeeping, the cashier opened a special account on
the books of the Belvue bank with Huston and Hooper, showing a
credit to each one of $2,500. Hooper was in bad health, and con-
tinued under a doctor's care until after January 6, 1925. During
the period of his illness he was at the bank infrequently. The
securities remained in the bank, and so far as its records and files
were concerned, appeared to be live assets of the bank. On January
6, 1925, Huston went to the bank, and Child delivered the securities
to him. Child dictated to the bank stenographer, who was also its
bookkeeper, an agreement that whatever was realized on the se-
curities above $5,000 should be returned to the bank. Huston
signed the agreement, and Hooper assented to it. When the securi-
ties were delivered to Huston, the special accounts on the bank's
books were closed. The money received from the Wamego bank on
the Huston and Hooper notes was appropriated by the Belvue bank,
and the Huston and Hooper notes to the Wamego bank have been
paid. The Belvue bank became insolvent about December 1, 1924.
Cora Weeks, bookkeeper and stenographer of the Belvue bank, testi-
fied as follows:

"I have seen the Tower mortgage and the Aeggers assignment. They went
out of the assets of the bank on January 5 or 6, 1925. They were turned
over to F. G. Hooper and J. M. Huston by Mr. Child, cashier. Prior to that
time they were among the assets of the bank. I heard Hooper, Huston and
Child talk over these securities the morning they were taken out. I rather
think Mr. Hooper was there. It arose from the $2,500 deposit of each of the
men. They felt they borrowed the money and were entitled to security for
it, they had put up personal notes for the benefit of the bank. They had
borrowed the money from the First National Bank in Wamego. I can't re-
member, but know it was decided that they were to get these two securities.
The Aeggers assignment showed on our records $1,939 before that time. There

had been $2,300 charged off. At that time Mr. Child dictated an agreement which I wrote on the typewriter. I cannot remember what it was. The Aeggers assignment of $1,939 and this $2,300 made over $5,000. It was agreed that if anything over $5,000 was collected, it was to be turned over to the bank. Since the bank closed I have been unable to find the agreement."

It will be observed the only fact definitely recalled by the witness relating to the terms upon which the securities went out of the bank was that if any sum over $5,000 was collected, the amount was to be turned over to the bank.

The district court found the note and mortgage were owned by the bank and were in its possession until January 6, 1925; that on January 6, 1925, Child, Huston and Hooper entered into an arrangement to constitute Huston and Hooper preferred creditors of the bank, and that pursuant to the arrangement the securities were taken out.

The questions of fact in the case were, whether the security agreement between Huston and Hooper and the cashier was made in August, 1924, in connection with the advancement for the benefit of the bank, or was made in January, 1925, when the note and mortgage were taken out of the bank; and if the agreement were entered into in August, 1924, whether it was an agreement for present security for the advancement. It was possible to harmonize the circumstantial evidence with either theory. Thus, the fact that the securities remained in the pouch in the bank where they were usually kept, indicated ownership by the bank. But the parties were all officers of the bank, and there was no occasion for change of possession until it became likely their management would soon terminate. The result is, the question narrowed down to whether the testimony of Child, Huston and Hooper should be believed. If their testimony was disbelieved, the testimony of the stenographer and the circumstances constituted some evidence of unlawful preference.

The court is confronted by this dilemma. The findings of the district court are broad enough to indicate the giving of the securities to plaintiffs was an afterthought, which did not occur until January 6, 1925. The brief for the receiver quotes the testimony of Child, Huston and Hooper to show an agreement for security made in August, 1924, and continues as follows:

"From this evidence it will be observed that the so-called agreement to transfer these securities to appellants was simply a verbal promise to do so.

Huston v. Tower.

It was in no sense a sale of the securities to appellants, nor was it a transfer of the same to them, because there was no delivery, nor could it be construed that the transaction created an equitable lien upon these securities. This original agreement made at the time or before the money was borrowed on August 8, was never carried out by the parties, and in fact was waived when, on January 6 following, the appellants took from the bank the securities in controversy under another and different agreement, which the evidence discloses was in writing."

Of course the district court is not bound by counsel's conception of the case, but if counsel's conception is correct, the judgment is probably erroneous.

The Tower and Aeggers items in the Belvue bank's real-estate account were offered to the Wamego bank as security for a loan of $5,000, and were rejected. By giving their notes to the Wamego bank, Huston and Hooper obtained $5,000 for the Belvue bank, which the Belvue bank received and used. The cashier's version of the arrangement for security follows:

"We talked about security to be given them. It was talked over before, and as testified here, the banking department objected to the Aeggers assignment. We figured it was good. They [the banking department] objected to the Tower mortgage. They [Huston and Hooper] said they would take them and put in $5,000. I said that the two amount to $6,000, and it was agreed that all above $5,000 was to be returned to the bank. I agreed to that, and the money was deposited in the First National Bank in favor of the Belvue bank."

If it was agreed in good faith that Huston and Hooper were then to have the Tower and Aeggers items as security for their advancements, mere delay in delivery of the securities did not destroy their right to them, and fulfillment after insolvency of the bank's existing obligation to deliver the securities did not constitute a preference forbidden by R. S. 9-142. (*Harris v. Randolph County Bank*, 157 Ind. 120.)

Counsel for the receiver cites the case of *Bank v. Bank*, 98 Kan. 109, 157 Pac. 392. The decision in that case, considered in its entirety, makes clear the principle to be applied here. In that case, a note secured by deposit of collateral contained an agreement that additional security should be given in the future on notice under certain circumstances. No collateral was set apart, and the agreement did not identify any particular collateral. The court held the giving of additional security on demand made after insolvency constituted preference. The opinion distinguished the case of *Sex-*

*ton v. Kessler*, 225 U. S. 90.   In that case a New York firm, pursuant to request, placed in a marked package and kept in its own vault securities for the protection of an English house.   When notified of what had been done, the English house gave the firm permission to withdraw and to substitute securities.   It was held delivery of the securities after insolvency did not constitute a preference.   In the opinion by Justice Holmes it was said:

"So far as the interpretation of the transaction is concerned it seems to us that there is only one fair way to deal with it.   The parties were business men acting without lawyers and in good faith attempting to create a present security out of specified bonds and stocks.   Their conduct should be construed as adopting whatever method, consistent with the facts and with the rights reserved, is most fitted to accomplish the result   . . .   The most obvious objection is that the continued physical power of the New York firm over the securities and its right to withdraw and substitute admittedly reserved are inconsistent with a title or lien of the English house in any form. But the decisions of this court and of New York agree that there may be title in a stronger case than this. . . .

"Whether enough has been done to give a right of any kind in certain property is a question of more or less. . . . A general promise to give security in the future is not enough.   But the present was a more limited and cautious dealing.   It was confined to specific identified stocks and bonds on hand, and purported to give an absolute present right, qualified only by possible substitution and perhaps by a right of partial withdrawal if the remaining securities had risen sufficiently in value.   It purported not to promise but to transfer; . . .   (pp. 96, 97, 98.)"

In the case of *Wiener v. Union Trust Co.*, 261 Fed. 709, the headnote indicates the nature of the decision:

"A transaction by which a corporation, more than four months prior to its bankruptcy, made a verbal and later a confirmatory written assignment of stock in other corporations as security for a loan, held not to constitute a voidable preference, although the certificates of stock were not delivered until within four months of the bankruptcy."   (Syl. ¶ 1.)

If in this instance Huston and Hooper did indirectly what the Wamego bank was solicited to do directly, and in effect loaned the Belvue bank $5,000 on the present security of the Tower and Aeggers items, as the Wamego bank might have done, it is plain the written agreement of January 6, 1925, was confirmatory of the original agreement, so far as transfer of the note and mortgage was concerned, and it is not important that the agreement was reduced to writing and the collateral was delivered after the bank had become insolvent.

Under the circumstances, the court deems it best to dispose of the appeal as follows: The judgment of the district court is vacated, and the cause is remanded with direction to find from the evidence introduced at the trial the facts relating to time and character of the agreement under which plaintiffs' claim to the note and mortgage originated, to apply the law as declared in this opinion, and to enter judgment accordingly.