No. 28,200.

J. M. Huston et al., *Appellants*, v. S. C. Tower et al., *Appellees.*

(268 Pac. 839.)

Opinion filed July 7, 1928.

A. E. Crane, of Topeka, E. S. Francis and E. C. Brookens, both of Westmoreland, for the appellants.

W. F. Challis, of Wamego, for the appellees.

The opinion of the court was delivered by

Hutchison, J.: The appellants in this case plainly and succinctly state the nature and character of this appeal, as follows: "There is but one question presented to this court at this time. Under the evidence in the case, is there anything to support the findings of the trial court?" It is purely a question of fact. Appellants claim the right to the note and mortgage being by them sued upon and foreclosed in this action by virtue of an oral agreement with the cashier of the bank made on August 30, 1924, and consummated January 6, 1925, by the actual delivery of the note and mortgage; while the appellees maintain that the assignment and delivery was made on January 6, 1925, by virtue of an agreement made that day. The facts in the case are fully set out in the opinion reported in *Huston v. Tower,* 123 Kan. 94, 254 Pac. 329, when this case was here before. The concluding paragraph of that opinion directed the trial court to make further findings as to the agreement of the bank to assign these securities to the plaintiffs, in the following language:

"Under the circumstances, the court deems it best to dispose of the appeal as follows: The judgment of the district court is vacated, and the cause is remanded with direction to find from the evidence introduced at the trial the facts relating to time and character of the agreement under which plaintiffs' claim to the note and mortgage originated, to apply the law as declared in this opinion, and to enter judgment accordingly." (p. 99.)

In compliance with such mandate the trial court reviewed the evidence, heard the arguments of counsel, and made the following findings of fact, which are a part of the journal entry:

"Therefore, in obedience to such mandate, the evidence introduced in the trial of this cause was again considered by the court, and after due and careful consideration thereof and hearing the arguments of counsel and being fully advised in the premises, the court finds that on the 25th day of January, 1925, an agreement was made and entered into by and between the plaintiffs and W. C. Child, as cashier of the Belvue State Bank, that plaintiffs should have the securities in controversy herein, upon condition, however, that if more than $5,000 was realized therefrom that the excess would be returned to the Belvue State Bank; this agreement was reduced to writing by the lady clerk, signed by the parties, but became lost and was not offered in evidence; that it was by virtue of this agreement that the securities in controversy were turned over to plaintiffs, and thereupon the two accounts upon the books of the bank, showing a credit of $2,500 to each of the plaintiffs, were closed and balanced;

"That the note and mortgage herein mentioned was at all the times stated owned and held by the said the Belvue State Bank, Belvue, Kansas, and in its possession until said 25th day of January, 1925; that on said 25th day of January, 1925, and for several months prior thereto, the said the Belvue State Bank, of Belvue, Kansas, was insolvent, which fact was known to the plaintiffs herein when they accepted and received said securities."

The evidence all shows the date in January was either the 5th or 6th instead of the 25th, but no point is made of that difference. Was there any evidence to support this finding? The plaintiffs, Hooper and Huston, were respectively president and vice president of the Belvue State Bank, which was shown to have been insolvent since about December 1, 1924, and closed its doors in February, 1925. These two officers, in order to help the bank, on August 30, 1924, gave their notes to a neighboring bank for $2,500 each, for which credit was given to the Belvue bank. The latter bank gave these two officers credit on the books of the bank for the fund so raised by them, and it stood that way until January 6, 1925, when these two accounts were canceled, apparently by checks. The securities in question were then taken out of the bank and given to them. The following are extracts of some of the evidence bearing on the subject on which the findings were made. The cashier, W. C. Child, said:

"I made the indorsement on January 6, 1925. That was the time it was completed. . . . The note was carried in the assets of the bank until January 6, 1925. . . . I do not remember that the note and mortgage were ever put up as collateral security prior to January 6, 1925. On January 6, I delivered the note and mortgage to J. M. Huston. . . . On January 5 or 6 I turned them over to Mr. Huston. At that time I charged off the special accounts and put the difference to undivided profits. . . . Up to that time they were in the pocketbook among the live assets of the bank and the accounts were on the ledger. . . . Miss Weeks wrote a contract on the typewriter as I dictated it. It was in the assets of the bank when it closed. The contract was that they would take these securities, and if they collected more than $5,000 they would return the balance to the bank."

### H. E. McMillan, assistant receiver, said:

"The records of the bank show that the note and mortgage in controversy was among the assets of the bank until January 6, 1925. It shows the Tower note taken out at that time. . . . The books show the bank got the money and some one took it up. It is marked as 'Loans Paid.' . . . The two special accounts of $2,500 each appear to have been deposited in the bank. They were taken up and paid January 5, 1925. The records show these checks were charged to F. G. Hooper, $2,500, and to Huston, $2,500, and they turned over $2,000 here and $3,000 here, making $5,000, which went out of the bank at that time."

### Cora Weeks said:

"I was bookkeeper. Yes, I saw these securities, the Tower mortgage and the Eggers assignment, in the bank and heard them discussed there. I had access to the assets of the bank. I saw them among the assets. The records show they went out January 5 or 6, 1925. I recall the fact. They were given to F. G. Hooper and J. M. Huston by Childs. They were among the assets before that. I heard these securities discussed that morning between those parties. . . . It arose from the $2,500 deposit to each of these men. They wished security for that, the special account. They said they felt they borrowed the money and entitled to security for it, and had put up their personal notes for the benefit of the bank. . . . I can't remember what Childs said, but know it was decided, but know they were to take these two securities, the Tower mortgage and the Eggers assignment. . . . After this conversation Mr. Childs dictated an agreement which I wrote on the typewriter. I cannot remember just what it was. It was made with copies. The substance of it was that these two securities, the Tower mortgage and the Eggers assignment, made over $5,000, and it was agreed that if over this sum was collected it should be returned to the bank. Since the bank has closed we have been unable to find the agreement. It was signed by all three of them."

### She later said in an affidavit:

"I do not want it understood from my testimony that I claim no contract existed as testified to by F. G. Hooper, J. M. Huston and W. C. Childs, as

testified to by them at the time the loan was made, but want it understood that I was not present and did not hear it, and knew nothing about the contract until I wrote it up, as testified to by me in January, 1925."

The evidence of both plaintiffs and the cashier, Child, tended to show the making of an oral agreement August 30, 1924, when the plaintiffs borrowed the money for the benefit of the bank, to the effect that they should have the security offered by the cashier to the other bank, which included this note and mortgage. The trial court may not have considered this of great weight because of the interest of the witnesses, or may have regarded this earlier plan as being abandoned by them in order to avoid injury to the reputation and standing of the bank by thus reducing or disposing of its assets.

It is not expected or required in order to support the findings that there be no evidence to the contrary, but that there be some substantial evidence to sustain and justify the findings. We think the evidence above quoted fully supports the findings of the trial court.

"The rule again followed that findings of fact, when sustained by evidence, are conclusive on appeal, although there was evidence on which a contrary finding could have been made." (*Randall v. Bird,* 118 Kan. 341, syl., 235 Pac. 103.)

"Record examined and held to show that the trial court's determination of a controverted fact was sustained by evidence which is conclusive on appeal." (*Baldwin v. Soldiers' Compensation Board,* 117 Kan. 129, syl., 230 Pac. 82.)

"Where there is ample evidence to support the findings and judgment, the evidence to the contrary has little significance in an appellate court." (*Putnam v. Putnam,* 104 Kan. 47, syl. ¶ 6, 177 Pac. 838.)

The judgment of the trial court is affirmed.