No. 20,172.

THE CITIZENS STATE BANK OF CHAUTAUQUA, *Appellee*, v. THE FIRST NATIONAL BANK OF SEDAN, *Appellant*.

SYLLABUS BY THE COURT.

1. BANKING—*Insolvent Bank May Not Give Preference to Creditors or Depositors.* Section 499 of the General Statutes of 1909, as amended by section 1 of chapter 65 of the Laws of 1911, which prohibits a bank from giving a preference to any depositor or creditor by pledging the assets of the bank, applies only to a bank which is insolvent.

2. SAME. An agreement in a promissory note executed by a solvent bank, by which it agrees to give additional securities in the future upon demand of the lender, is a valid agreement only so long as the borrowing bank remains in a solvent condition. The collateral agreement is limited by the statute (Gen. Stat. 1909, § 499, amended by Laws 1911, ch. 65, § 1) which forbids a bank to give a preference to any depositor or creditor.

3. SAME—*Agreement to Give Additional Securities to Bank's Creditor—Agreement Valid only so Long as Bank Remains Solvent.* A solvent bank borrowed $10,000 from another bank and gave its promissory note, pledging at the same time certain of its assets as collateral security. The note contained an agreement to give additional security upon notification by the holder. Subsequently, when the borrowing

bank was insolvent, its officers at the demand of the holder turned over additional assets of the bank to secure the indebtedness. Upon these facts it is held that the previous agreement did not create an equitable lien on the assets subsequently turned over, and that replevin will lie at the suit of the borrower to recover the assets turned over in violation of the statute.

4. SAME—*A Preferred Creditor Can Not Retain Assets of Bank Transferred During Bank's Insolvency.* Notwithstanding the statute which prohibits banks from preferring creditors contains no declaration that any act in violation thereof shall be void, it is held that a creditor who accepts a preference from an insolvent bank will not be permitted to retain the benefits of the transaction.

5. SAME—*Replevin of Insolvent Bank's Assets.* On the facts stated in the opinion it is held that it was not a condition precedent to the plaintiff's right to maintain the action of replevin that it tender back certain securities surrendered by the defendant at the time the additional securities were turned over.

Appeal from Chautauqua district court; ALLISON T. AYRES, judge. Opinion filed May 6, 1916. Affirmed.

*A. M. Jackson,* of Winfield, *Sanford B. Ladd,* and *Charles E. Small,* both of Kansas City, Mo., for the appellant.

*S. M. Brewster,* attorney-general, *S. N. Hawkes, John L. Hunt,* assistants attorney-general, and *W. H. Sproul,* of Sedan, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was to recover possession of certain notes, mortgages and other evidences of debt, or their value. The plaintiff prevailed and the defendant appeals.

The First National Bank of Sedan is merely a nominal defendant, holding the securities in controversy for collection as the agent of the defendant, the Traders National Bank of Kansas City, Mo. At the time the action was brought the Citizens State Bank of Chautauqua, hereinafter referred to as the Chautauqua bank, was insolvent and in the hands of the state banking department. From August, 1911, this bank and the Traders National Bank, which will be referred to as the Kansas City bank, were correspondents, the Chautauqua bank keeping an account with the Kansas City bank, against which it frequently issued exchange. It had borrowed $10,000 from

the Kansas City bank, evidenced by two notes which were due February 1, 1915. On January 26, 1915, it owed on one of these notes $5000, and on the other $3000. The money had been borrowed long before, and the notes had been renewed from time to time. The original and the renewals were in the same form, and contained the following provision:

"And being desirous of securing this note and all other liabilities to said bank, now existing or which may hereafter arise, we hereby pledge and deliver for that purpose, to said bank and its endorsees and assigns as collateral security for the payment of said note and said other liabilities, present and future, sundry notes, being all those hereto attached and all additions to them and all substitutions for them in the course of business, and we agree to give additional security to keep up the present margin should the market value of the above securities decline, upon notification to us by the holder of said note or liabilities or any of them, within twenty-four hours after receipt of said notice."

From October, 1914, until the time of the transaction in controversy, the Kansas City bank had complained that the Chautauqua bank had not remitted promptly the proceeds of collections sent by the Kansas City bank, and there was considerable correspondence over the matter. The Chautauqua bank had recently sent about $10,000 additional security, but the Kansas City bank had become suspicious as to the character of some of the collateral. Because of this, on January 23, 1915, it sent Mr. Alexander, its assistant cashier, to Chautauqua for the purpose of obtaining additional collateral. He took with him the collateral which the bank held (the face value of which amounted to about $25,000), and called the attention of Turner, cashier of the Chautauqua bank, to the appearance of some of it. Turner's explanations were not satisfactory, and Alexander informed him that he intended to stay until he got other collateral. Turner failed to keep an appointment with Alexander at the bank Saturday afternoon, and left town. On Monday Alexander, in company with a banker from Bartlesville, Okla., who came to Chautauqua in the interest of the Kansas City bank, went to the Chautauqua bank and found Mrs. Turner in charge. She informed them that she had heard nothing from her husband, but that she supposed he would be back. They asked her to turn over to them other collateral security, and explained that the Kansas City bank had a right to it, and that when the $8000 was paid

the surplus collateral would be returned. Mrs. Turner then turned over to them for examination all the notes and securities which the bank had in its vault. Later in the day J. R. Dominick, president of the Kansas City bank, came to Chautauqua. J. M. Vandeventer was president of the Chautauqua bank, but was not active in its management. He lived on a farm and came to the bank once or twice a week. On the afternoon of Monday, January 26, Alexander sent for him, and when he arrived the parties went to the bank and examined the securities which had been selected. About that time a letter arrived from Turner, addressed to Mr. Vandeventer, containing a statement that some of the notes held by the Kansas City bank and other banks as collateral were forged by him, but that the money obtained thereby had all been used for the benefit of the bank, and not for himself. While the officers of the Kansas City bank were there they learned from Mrs. Turner that the bank had only about $30 in currency on hand. It was apparent that Turner had absconded, and that the bank was insolvent. Under these circumstances, the president of the Chautauqua bank, at the request of the officers of the Kansas City bank, turned over and indorsed to the latter notes and other evidences of debt, the face value of which was $38,000, and which constituted substantially all the assets and securities of the bank. At the same time the Kansas City bank turned back the former securities held by it. In explanation of the action of the Kansas City bank in insisting upon such a large amount of collateral security, it is said that by reason of the confession of cashier Turner the Kansas City bank was unable to ascertain at that time how much of the collateral could be depended upon as genuine. The Kansas City bank immediately placed the collateral in the hands of the First National Bank of Sedan, with instructions that when the $8000 had been collected the remaining securities were to be turned back to the Chautauqua bank. After Mr. Dominick left Sedan he stopped at Topeka and informed the bank commissioner of the transaction.

The jury by its verdict found for the plaintiff, and found that the value of the collateral still in the hands of defendant was $6694.91. The judgment rendered upon the verdict was for the return of the securities and moneys collected, or, in lieu of such return, a money judgment for their value.

Plaintiff bases its right to recover largely upon the provision of the banking law, which reads:

"No bank, banker, or bank officer shall give preference to any depositor or creditor by pledging the assets of the bank as collateral security, . . . provided, 'that any bank may borrow money for temporary purposes not to exceed in amount fifty per cent of its paid-up capital, and may pledge assets of the bank not exceeding twenty per cent. in excess of the amount borrowed, as collateral security therefor." (Laws 1911, ch. 65, § 1.)

The first question to determine is whether the transaction of January 26, 1915, is a preference prohibited by this statute. The defendant claims that in this respect the giving of the securities did not constitute a preference for the reason that they were turned over in pursuance of a promise made long prior thereto, and that the transaction was merely the consummation of an arrangement made at the time the notes were executed. It is said that by virtue of the terms of the previous agreement the Kansas City bank had possessed in equity and good conscience a lien which developed into actual possession when the securities were turned over, and that whether it was a preference depends not solely upon the transaction of January 26, but the original promise.

Conceding that the agreement in the note is a valid one, it must be held, we think, that it is limited by the statute, which expressly prohibits the giving of collateral so as to create a preference. The provision in the note reads:

". . . and we agree to give additional security to keep up the present margin should the market value of the above securities decline, upon notification to us by the holder of said note or liabilities or any of them, within twenty-four hours after receipt of said notice."

This is no more than an agreement to give additional security in the future in case it is demanded. If the demand or request had been made at a time when the bank was entirely solvent, the agreement could have been lawfully complied with, provided the amount of collateral deposited was not more than twenty per cent in excess of the debt. So long as the bank continued solvent it was a valid agreement, and no longer. One of the principal cases relied upon by defendant is *Sexton v. Kessler*, 225 U. S. 90, 98. There the bankrupts, more than four months before the petition in bankruptcy was filed, placed

in their own vaults a separate package containing securities, marked: "Escrow for account of Kessler & Co., Ltd., Manchester." At the same time they wrote Kessler & Company, "This escrow is intended as a protection against our long drafts against your good selves." Later, at the request of the creditor, they sent a certificate describing the particulars as to the nature and character of the securities, and thereafter notified the creditor from time to time of substitutions made. Within four months of the time the debtor became bankrupt it turned over the securities to an agent of the creditor. It was held that the possession of the securities was taken pursuant to a pre-existing right, supported by equitable principles. The distinction between the situation there and a case like the present one is stated in the opinion in the following language:

"So a general promise to give security in the future is not enough. But the present was a more limited and cautious dealing. It was confined to *specific identified stocks and bonds on hand,* and purported to give an absolute *present right,* qualified only by possible substitution, and perhaps by a right of partial withdrawal if the remaining securities had risen sufficiently in value. It purported *not to promise, but to transfer."* (p. 98.) (Italics ours.)

It is quite apparent, we think, that *Sexton v. Kessler,* supra, can not be relied upon by the defendant, because it recognizes that a mere promise to give additional security without something equivalent to a setting aside of particular collateral is not enough. That the subsequent delivery of additional securities under a mere general promise made prior thereto will not relate back so as to render the transaction free from the prohibition of a somewhat similar statute, was decided in *Torrance v. Bank,* 66 Kan. 177, 71 Pac. 235. In that case section 67*a* of the bankruptcy law of 1898 (30 U. S. Stat. at Large, ch. 541, § 67, subdiv. a, p. 564) was under consideration. The statute reads:

"Claims which for want of record or for other reasons would not have been valid claims as against the claims of the creditors of the bankrupt shall not be liens against his estate."

The syllabus in *Torrance v. Bank,* supra, reads:

"An agreement made, while negotiating for a loan, to make repayment out of a certain fund, or the proceeds of a particular enterprise, does not create a lien on the fund or the proceeds of the enterprise, and where repayment is made out of the designated fund within four months of

proceedings in bankruptcy, such payment shall be deemed to be preferential and voidable at the suit of a trustee." (Syl. ¶ 1.)

The opinion (p. 182) quotes with approval *In re Sheridan*, 98 Fed. 406, in which the syllabus reads:

"An agreement to pledge personal property as security for a debt is not executed where the goods are not delivered to the creditor, nor set apart and treated as his property; and, where the creditor takes possession of the property a few days before the filing of a petition in bankruptcy against the debtor, the transaction is voidable as a preference, notwithstanding that the original agreement was made more than four months before that time."

The agreement in the notes was a mere promise to give additional security whenever called for. There was no setting apart of any particular collateral, nor did the agreement identify any particular collateral. We think it is quite obvious that it did not create an equitable lien upon the securities in controversy, and that the promise was necessarily limited by the statute.

The word "preference" has often been defined by courts:

"The common definition of 'preference' as found in law dictionaries, is the paying or securing to one or more of his creditors, by an insolvent debtor, the whole or a part of their claims, to the exclusion of the rest." (6 Words & Phrases, p. 5498.)

For reasons of public policy the legislature saw fit to safeguard the interests of depositors and other creditors of banks by enacting regulations controlling the operation of banks and limiting their power to prefer one creditor over another at a time when the bank is insolvent. Section 1 of chapter 65 of the Laws of 1911 prohibits a bank from giving preference to any depositor or creditor by pledging the assets of the bank, with a provision that the bank may borrow money for temporary purposes not to exceed in amount fifty per cent of its paid-up capital, and may pledge as collateral security therefor the assets of the bank not exceeding twenty per cent of the amount borrowed.

It is unnecessary to determine the question discussed in both briefs as to the authority of the president of the bank to indorse and turn over the securities in controversy. If it had been the cashier who acted, and the board of directors had authorized and directed the securities to be indorsed and delivered to the Kansas City bank, the latter would have ac-

quired no right to retain them, for the reason that the Chautauqua bank was insolvent and the transaction was prohibited by the statute. Nor is it necessary to consider previous decisions, upon which defendant relies, in which it has been held that a debtor has a right to prefer one creditor over another so long as he maintains the *jus disponendi* of his property. The statute lays down a different rule for a bank and declares that "no bank shall give preference to any depositor or creditor by pledging the assets of the bank as collateral security."

Defendant makes the further contention that, even if the transaction of January 26 constituted a preference, it was not void for the reason that the statute nowhere declares that an act done in violation of the prohibition shall be void, and it is argued that the only effect of the statute is to authorize the banking department of the state to commence proceedings against the bank for the appointment of a receiver and for winding up its affairs. It is insisted that this proposition is settled by the highest authorities. The cases relied upon are those where a national bank had made loans on real estate. The national banking act, except by implication, does not prohibit national banks from making loans of this character. These cases hold that congress never intended that the stockholders and creditors of a national bank should be punished by permitting the borrower to escape liability on the mortgage and retain the proceeds of his loan. These cases and the present case are wholly dissimilar. To permit one who has obtained money from a national bank on real-estate security to retain the money and the security too, would be abhorrent to all ideas of justice and equity. The law was not enacted for his benefit, but for the protection of the bank, its stockholders, creditors and depositors. In prohibiting banks from giving a preference the legislature certainly never intended that the party accepting it should be permitted to retain the benefits of the unlawful transaction, even though it might call for the entire assets of the bank, and result in depriving other creditors of any security. From the time a bank becomes insolvent all creditors stand on an equal footing as to assets on hand. Those creditors who were diligent when the bank was solvent are permitted to retain the benefits of securities surrendered then. The moment a bank becomes insolvent its assets be-

come a trust fund for the *pro rata* payment of the claims of all its creditors. The defendant concedes that the facts known to its officers at the time of the transaction were sufficient to put it upon inquiry as to the solvency of the bank. We think the facts show conclusively that defendant knew the bank had not only failed to keep its legal reserve, but that its cash was gone; and the officers of the defendant carried away with them substantially all the securities and assets of the bank, except those it returned.

Having defined "insolvency," and stated the conditions which will render a bank insolvent, the instructions charged that, for the purpose of securing an actual loan, the bank had the right to assign its securities to the Kansas City bank, and that under the provisions in the note the latter had the right to require the plaintiff to exchange or supplement such collateral at any time it became dissatisfied with the security, and that plaintiff by its officers had the right to furnish other and additional security "so long as the plaintiff was solvent, or so long as the Kansas City bank did not know or have reason to believe that it was insolvent," but if the jury found from the evidence that the securities in controversy were turned over to the Kansas City bank for an indebtedness already in existence at a time when the plaintiff was insolvent, and the Kansas City bank knew or had reason to believe it was insolvent, then under those circumstances and conditions the Kansas City bank could not hold them, and thus become to that extent a preferred creditor. Complaint is made of these instructions because the words "have reason to believe it was insolvent" do not appear in the statute, and it is insisted that the instructions presented an issue in no way involved in the case. The Kansas City bank concedes that it had reason to believe the plaintiff was insolvent, but insists that the fact is wholly immaterial. On this particular phase the instructions were too favorable to defendant. If the bank was insolvent on January 26, 1915, that fact was sufficient to render the transaction obnoxious to the statute. The court gave the defendant the benefit of the qualification as to its knowledge or notice, and it has no reason to complain. The instructions clearly defined and applied the law governing the rights of the parties, and, with the slight exception noted, we approve the

construction given by the learned judge of the trial court to
the statute prohibiting banks from preferring one creditor
over another.

One other contention remains. It is urged that plaintiff
can not maintain this action without first tendering back the
securities formerly held by the Kansas City bank, and which
were turned over to the plaintiff as part of the same transac-
tion. There are two reasons why the contention can not be
sustained.

First, there is not the slightest evidence to show that the
other collateral was surrendered in consideration of the giving
of the new. The position taken by the Kansas City bank at
the trial, and before this court, has been consistent. It is, that
it was entitled under the agreement in the notes to demand
and receive additional collateral, and that its right to do so
did not depend upon any contract or arrangement entered into
on January 26, 1915. Defendant's right to the possession of
the securities in controversy is the only thing directly involved
in this action, and all that plaintiff was required to show
is that it was entitled to possession. An offer to return a
portion of the other securities, equal to twenty per cent above
the lawful amount the plaintiff bank was permitted to borrow,
would have been entirely proper and equitable. But it can not
be held that such an offer was a condition precedent to the
plaintiff's right to maintain this action.

Second, this is an action in replevin; the sole question is the
right to the possession of certain securities. Replevin is
strictly a law action. (Cobbey on Replevin, 2d ed., § 257.)
There are cases which hold that where a vendor has received
notes for the purchase price, and desires to rescind the sale
for fraud and sue in replevin for the property, he must first
return the notes or other consideration (*Doane et al. v. Lock-
wood et al.,* 115 Ill. 490, 4 N. E. 500; *Parrish v. Thurston,* 87
Ind. 437), but this is because he is not entitled to possession
until he has rescinded, and the right to rescission does not
ripen until tender of the consideration. In *Rucker v. Donovan
& Feiferlich,* 13 Kan. 251, 19 Am. Rep. 84, a constable who
had paid the freight charges took possession of goods from a
carrier. It was held that until he was reimbursed for the
freight charges replevin would not lie against him by one

having the right to possession. There are a few well-considered cases which show a tendency of the courts to give the action of replevin such flexibility as to adjust in that action all equities arising between the parties and growing out of the same transactions. (*Workman v. Warder,* 28 Mo. App. 1; *Babb v. Talcott,* 47 Mo. 343; *McIntire v. Eastman,* 76 Iowa, 455, 41 N. W. 161; Cobbey on Replevin, 2d ed., § 794.) Thus, in *Boutell v. Warne,* 62 Mo. 350, it was held that in replevin based on a claim of purchase, where the jury find the right of possession to be in defendant, and it appears that plaintiff paid part of the consideration, it was error to render judgment for the defendant for the full value of the property. The opinion (p. 353) cites *Dilworth v. McKelvy,* 30 Mo. 149, where it was said:

"The judgment in each case must be modified by the circumstances, so that the merits of the controversy may be settled in one action. The statute is a general one, designed to meet all the exigencies which the old action of replevin did, and the equity of its provisions will embrace these modifications of the forms in which judgments should be entered." (p. 155.)

In *Hickman v. Dill,* 32 Mo. App. 509, the Kansas City court of appeals said:

"Suits in replevin are said to be, in some respects, *sui generis;* and the inclination of the courts of this state has been to give to them a flexibility sufficient to meet exigencies and adjust all equities arising in such actions." (Syl.)

However much we might feel inclined to favor the extension of the remedy in replevin actions to include an adjustment of all equities between the parties that arise out of the controversy, and thus prevent a multiplicity of actions, it is apparent that this is not a case where the court would be justified in doing so. Although the answer mentions the fact that the Kansas City bank "surrendered the collateral first given," nowhere in the answer does the defendant ask that the court require the plaintiff to restore any portion of the collateral surrendered. Nor was that equitable claim presented to the trial court. It is conceded by the attorney-general, who appears for the state banking department in charge of plaintiff bank, that the loan represented by the note was valid to the extent of $5000, which was one-half the bank's capital stock, and that the Kansas City bank had a right to retain

collateral of the face value of $6000. We can not, however, in this action determine what, if any, equitable rights the Kansas City bank may have to a portion of the securities which it turned back to the plaintiff on January 26, 1915. That is a matter which can be adjusted by agreement or tried out in another action.

The judgment is affirmed.