## COMMERCIAL GUARANTY STATE BANK et al. v. CITY OF LONGVIEW et al.* (No. 3557.)

Court of Civil Appeals of Texas. Texarkana. Oct. 20, 1928.

Rehearing Denied Nov. 22, 1928.

*Writ of error granted.

John W. Goodwin, L. C. Sutton, and Joe T. Goodwin, all of Austin, for appellants.

Young & Stinchcomb, Edwin Lacy, and W. C. Hurst, all of Longview, Coke & Coke and T. W. Davidson, all of Dallas, and Davidson, Blalock & Blalock, of Marshall, for appellees.

HODGES, J. In January, 1926, the Commercial Guaranty State Bank of Longview was selected as the legal depository for the city of Longview. The same bank had been such depository the preceding year. At the time the selection was made in 1926, the city had on deposit with the bank the sum of $41,404.71. In the effort to qualify for depository in 1926, the president of the bank had an agreement with the city manager of Longview and a committee of city officials that, instead of executing a bond with personal security as required by the statute, the bank might pledge government bonds and United States Treasury notes to the amount of $24,400 as security for the city's deposits. It was agreed that those bonds and notes should be placed in the hands of the Federal Reserve Bank of Dallas, Tex., and by it held in trust for the benefit of the city of Longview. Some time later the Federal Reserve Bank declined to longer act as such trustee, and by consent of all parties the securities were transferred to the American Exchange National Bank of Dallas, who agreed to hold them as trustee for the same purpose for which they were originally deposited with the Federal Reserve Bank. On account of a reduction in the amount of the city's deposits at that time it was agreed that the amount of securities to be held in trust should be reduced to $22,500. Thereafter United States bonds and treasury notes payable to bearer were held by the American Exchange National Bank of Dallas, in accordance with the agreement above stated. On September 29, 1926, the Commercial Guaranty State Bank failed, and its affairs passed into the hands of the banking commissioner for liquidation. At the time the bank closed its doors, it owed the city for deposits the sum of $30,184.57. This suit was later filed by the city of Longview against the bank, the banking commissioner, and the American Exchange National Bank, to establish a claim against the assets of the Longview bank in the hands of the banking commissioner, and to foreclose a lien on the bonds and treasury notes held by the Dallas bank.

The city pleaded in the alternative that, if the bonds and treasury notes were not subject to the lien asserted, it have judgment establishing its debt as a preferred claim against the assets of the Longview bank, then in the hands of the banking commissioner. As the basis for the preferred claim, the city alleged that the Longview bank had perpetrated a fraud in securing the contract for the city's deposits while the bank was insolvent. In still another count the city alleged, in substance, that, if the designation of the Commercial Guaranty State Bank as city depository was unlawful because the bank could not qualify as city depository by pledging the bonds and treasury notes, then that the funds of the city placed in the bank constituted a trust fund, and for that reason the city was entitled to a preferential payment out of the assets of the bank.

The answer of the American Exchange National Bank, so far as material, alleged, in substance, that it held the bonds as a mere trustee, or stakeholder, and expressed a willingness to deliver them to the party to whom the court might award them in the trial of the case.

The other defendants answered by general demurrer and general denial, and specially pleaded that J. R. Sparkman, the president of the Longview bank, was not authorized to pledge the bonds as security for the city deposits, and that Bothwell, city manager for the city of Longview, was not authorized by the city to accept them as such security. They further alleged that the Commercial Guaranty State Bank did not have the power to secure deposits in that manner, and that the contract pledging its assets was contrary to public policy and void.

H. L. Foster and sixteen other parties intervened in the suit, each filing a separate petition, claiming certain designated bonds and treasury notes among those pledged by the bank to the city. They alleged that they had left those instruments with the bank for safe-keeping only, and that neither the bank nor Sparkman had any authority to sell or mortgage them for any purpose.

The city of Longview filed a supplemental petition, pleading estoppel against the interveners and other facts necessary to present the issues hereinafter discussed.

The case was tried before the court without a jury, and findings of fact and conclusions of law were filed at the request of the parties.

In addition to the facts previously stated, the court found that the interveners were the legal owners of $17,500 worth of the bonds pledged by Sparkman to the city; that those bonds had been left with the Commercial Guaranty State Bank for safe-keeping only, and that the use made of them by Sparkman was unauthorized. He further found that the officials of the city of Longview who con-

tracted for the security were deceived by the false representations of Sparkman as to the ownership of the bonds, and were thereby induced to accept the bonds as security for the city deposits; that, had they known that the bonds were not the property of the bank, they would have withdrawn the city funds and would have selected another depository.

In the final adjudication the court awarded the bonds to the interveners. He also entered a judgment in favor of the city of Longview against the banking commissioner for the amount of money due the city at the time the bank failed. That judgment was made a preferred claim against the assets of the bank in the hands of the commissioner. The court also allowed an attorney's fee of $250 in favor of Coke & Coke, who represented the American Exchange National Bank in the trial of the case.

Two appeals are prosecuted—one by the city of Longview, complaining of the judgment in favor of the interveners for the title and possession of the bonds; and the other by the banking commissioner, who complains of the judgment making the debt due the city by the Longview bank a preferred claim against the assets in his hands. In the disposition of the case we shall first consider the appeal of the banking commissioner.

■■ The classification of the debt of the city against the bank as a preferred claim was based by the trial court upon a finding that a fraud had been committed by the bank officials in securing the contract for the deposit of the city funds. The court not only found that the bank did not own the bonds pledged as security, but was insolvent at the time the contract of January, 1926, was made. The findings as to the fraud above stated are fully sustained by the evidence. But that fact alone does not entitle the city to a preferred claim against the assets of the bank.

The right to such preference in cases of this character rests upon the right of the depositor to rescind the contract of deposit and reassert title to the money which the bank obtained by the fraud. He must also be able to trace the money deposited, or that into which it has been converted, into the hands of the banking commissioner. Austin v. Lacy et al. (Tex. Civ. App.) 2 S.W.(2d) 876; Tyler State Bank v. Shivers (Tex. Com. App.) 6 S.W.(2d) 108, and cases there referred to. Under the facts before us the fraud perpetrated by the officials of the bank clearly entitled the city to a recission of its contract selecting the bank as the city depository; but the evidence fails to show that any of the funds deposited under that contract passed into the hands of the banking commissioner. In the Shivers Case above referred to the court said:

"If the trustee has dissipated or converted the trust money or property so that it cannot be distinctly traced into any specific property which is a part of his estate, and such estate is insolvent, the wronged cestui que trust must stand on the same footing as a general creditor."

After referring to a number of cases in support of that proposition, the court then continues:

"Under some of the earlier decisions it was only necessary to show that the owner's property had been mingled with that of the trustee in order to impress a lien on the trustee's entire property. Most of the courts announcing this doctrine have modified or overruled the same until now the practically universal rule is that if the property has become so mingled with the general property of the trustee that it can be no longer distinctly traced and identified, the trust is destroyed, and the cestui que trust occupies no better position than any other general creditor."

The facts in this case show that, at the time the depository contract of January, 1926, was made, the bank owed the city on deposits made during the preceding year the sum of $41,404.71. While other deposits were made during the year 1926 under the contract of that year, the indebtedness of the bank for all deposits had been reduced by withdrawals on checks by the city to the sum of $30,-184.57 at the time the bank closed its doors. It thus appears that the bank had returned more money than it received under the contract obtained by the fraud. The evidence does not warrant the conclusion that any of the funds of the city were among the assets taken charge of by the banking commissioner. For the reasons stated, we think the court erred in classifying the debt due the city by the bank as a preferred claim against the assets in the hands of the commissioner. As to those assets, the city occupies the attitude of a common creditor.

■■ We pass, then, to the other branch of the case, the appeal of the city from the judgment awarding to the interveners the title and possession of the bonds. The evidence is undisputed that $17,500 of those bonds belonged to the interveners, and that the bank had no authority to pledge them to the city as security. But the evidence also shows that the bonds were negotiable instruments, were payable to bearer, and were in the lawful custody of the bank; that the city contracted for its lien upon the bonds in good faith for a valuable consideration and before any of them had matured. The lien claimed by the city is resisted upon the following grounds: (1) That the bank, having no title to the bonds, could convey no lien to the city. (2) That the contract by which the bonds were pledged as security for the city deposits was against public policy and void. These objections will be considered in the order stated.

As a general rule, one who has no title to personal property can convey none to a third party; but an exception to that general rule

has been applied by the courts to transfers of negotiable instruments. Greneaux v. Wheeler, 6 Tex. 521; Ross v. Smith, 19 Tex. 171, 70 Am. Dec. 327; Liddell et al. v. Crain, 53 Tex. 549; Wilson v. Denton, 82 Tex. 531, 18 S. W. 620, 27 Am. St. Rep. 908; Herman v. Gunter, 83 Tex. 68, 18 S. W. 428, 29 Am. St. Rep. 632; Alexander v. Bank, 19 Tex. Civ. App. 620, 47 S. W. 840; Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865; Jones on Pledges and Collateral Security (2d Ed.) p. 115; 3 R. C. L. p. 1000. In the authority last referred to, the author, after discussing the question, says:

"It may be taken, then, to be the well-settled rule of law that the transfer of stolen commercial paper negotiable by delivery to a bona fide purchaser for value without notice and before maturity vests him with a good title against all the world."

Our conclusion is that the facts of this case bring the city within the exception stated above to the general rule applicable to transfers of personal property, and that the city is entitled to assert the rights of an innocent purchaser for value unless precluded by the invalidity of the contract.

In their second objection, counsel for interveners contend that a state bank has no power to mortgage its assets as security for a deposit; that such a contract is contrary to public policy and void. Of course if the bank, in this instance, could not, for the reason stated, mortgage its own assets as security for the city deposits, it could not mortgage the property of others held by it for safe-keeping only. If the contract was contrary to public policy, those who dealt with the bank officials were charged with notice of such illegality. In support of the proposition that the contract was illegal as against public policy, the following cases are referred to: Commercial Bank & Trust Co. v. Citizens' Trust Co., 153 Ky. 566, 156 S. W. 160, 45 L. R. A. (N. S.) 950, Ann. Cas. 1915C, 166; Carter v. Brock, 162 La. 12, 110 So. 71; County of Divide v. Baird, 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296; Bailey v. State, 72 Okl. 203, 179 P. 615. The following excerpt from the case first cited fairly states the ruling and the reason for its adopting:

"Such a practice, if indulged and authorized, might work great injustice and inflict financial loss, not only upon the depositors, but upon the stockholders as well. Large depositors, if secured, might absorb the greater part of the assets of the bank, and inflict loss upon unsecured depositors and financial ruin upon innocent stockholders under the double liability law. The law contemplates, and was evidently framed to insure, fair and uniform dealings by the banks with all of their depositors. A secret pledge to secure one, while others are left without security, although it may be without specific intent to defraud, would nevertheless, in case of loss, justify such an inference. Public policy will not, therefore, tolerate a practice which might, sooner or later in the event of financial trouble with the bank, enable it to pay and protect the favored few at the expense of the equally deserving many. If the fact was known that a bank had secured some one or more of its depositors and left the others unsecured, no prudent person would deposit with it. No bank would advertise that it engaged in such a practice, because depositors, who were not provided for, would be driven away. The very fact that the transaction is one that will not stand the test of publicity is a strong argument against its legality, as well as its necessity. Banks publish statements of their assets, and individuals deposit on the faith of these published statements. It is well known that good statements as to assets induce people to deposit their money in banks making such statements. It would be a crowning act of injustice to hold that deposits thus induced are nevertheless cut off from sharing in these assets until some unknown favored few, who have been secretly secured, are satisfied; and it would be a palpable fraud on the part of a bank thus to procure deposits, when its assets were secretly pledged."

To the above cases may be added that of Ark.-La. Improvement Dist. v. Taylor, 6 S.W. (2d) 533, recently decided by the Supreme Court of Arkansas. We find, however, upon examination, that the courts of the states of Illinois, Iowa, Colorado, Pennsylvania, Arizona, North Carolina, and Kansas have adopted a contrary doctrine upon that subject. See the following: Ward v. Johnson, 95 Ill. 215; Richards v. Osceola Bank, 79 Iowa, 707, 45 N. W. 294; McFerson v. National Surety Co., 72 Colo. 482, 212 P. 489; Ahl v. Rhoads, 84 Pa. 319; Williams v. Hall, 30 Ariz. 581, 249 P. 755; Page Trust Co. v. Rose, 192 N. C. 673, 135 S. E. 795; Citizens' State Bank v. First National Bank, 98 Kan. 109, 157 P. 392, L. R. A. 1917A, 696. See, also, 51 A. L. R. 313, for a discussion of the different cases bearing upon that subject.

In the absence of any decision of that question by our Supreme Court, we are inclined to adopt the doctrine announced in the second group of cases above referred to, because we think they are more in accord with sound legal principles. It is conceded that state banks have the power to borrow money and may pledge as security for such loans their assets, such as notes and bonds. A general deposit of money in a bank creates the relation of debtor and creditor between the bank and the depositor, not materially different from that which arises between a borrower and a lender of money. The beneficial results to the bank are the same and the obligation to repay the money is equally binding whether the transaction be a loan or a deposit. It appears to us that there is no sound reason for denying a bank the power to pledge its assets to secure a deposit, while permitting it to give such security for a loan of equal value. The only basis for the distinction is that to allow banks to secure some depositors by a pledge of its assets reduces the value of the resources upon which the unse-

cured depositors must rely for repayment of their deposits. We may admit that it does have that effect. But does not the same result follow when the same assets are pledged to secure a loan of equal value? Securing a deposit by a pledge of its assets has no more effect upon the solvency of the bank, or upon its ability to repay its unsecured depositors, than does the pledging of an equal amount for a loan of equal value. But, whatever may be said of the soundness of the distinction in the banking policy of other states, there is no good reason for its adoption in this state. At the time the contract of January, 1926, which is here attached, was made, state banks organized under the laws of Texas were required to secure their general depositors in some of the methods designated by statute. The giving of such security was made a condition precedent to the right of the bank to receive deposits.

Article 437 of the Revised Civil Statutes of 1925 and subsequent articles relating to the operation of state banks specifically provide for the creation of the state guaranty fund and specify how it shall be applied in the payment of depositors of insolvent state banks. Article 475 provides for the bond security system, and expressly authorizes banks adopting that system to pledge as collateral security such of their assets as United States bonds and certain specified municipal bonds. Article 2529 authorizes state banks selected as state depositories to pledge as security United States bonds and certificates of indebtedness, bonds of the state of Texas, and other bonds owned by the bank. Article 2547 authorizes commissioners' courts, in selecting depositories, to accept substantially the same character of assets as security for county deposits. While no such provision is found in the articles which authorizes the selection of city depositories, its absence does not necessarily imply legislative disapproval of the banking policy authorized in contracting for state and county depositories. We therefore conclude that the contract between the bank and the city was not void for lack of power on the part of the bank to pledge its assets as security for city deposits. General depositors in this state are not entirely dependent for repayment upon the assets of state banks.

■■■■ The validity of the contract between the city and the bank is also attacked upon the ground that the city had no legal authority to accept such property as United States bonds as security for its deposits. Article 2559 of the Revised Civil Statutes authorizes every incorporated city in this state to receive from banking corporations sealed proposals for the custody of the city's funds. Article 2560 provides that, after the selection of a city depository, it shall be the duty of the banking corporation, association, or individual banker to execute a bond payable to the city, to be approved by the mayor with the concurrence of the city council, with not less than three solvent sureties who shall own unincumbered real estate in the county in which the city is located of as great value as the amount of the bond; or the depository selected may make such bond in some approved fidelity and surety company. Article 2561 makes it the duty of the city treasurer upon approval of such bond to immediately transfer the funds of the city to the depository so selected, and relieves the treasurer from liability for the safe-keeping of the funds thus transferred. It thus appears that a city may contract for the deposit of its funds and for the payment of interest on daily balances, but is required to take a certain character of security different from that taken in this instance. The question then is, Does the taking of a different kind of security from that specified in the statute so vitiate the contract as to relieve the bank from the terms of its contract to repay the city for its deposits?

The proof shows that the city advertised for and received bids in the manner provided by law for the selection of a depository. The only irregularity in the proceedings was the taking of a security different from that provided by the statute. Counsel for interveners contend that this variance from the statutory requirement renders the contract selecting the bank as the city depository illegal and for that reason unenforceable by either party. We may concede that this contract is not one which the city was authorized by statute to make, and that the bank could not have compelled performance by the city if the latter had refused to comply with its agreement to deliver its funds to the bank as a depository. But the contract is not one that is prohibited by law or contrary to any rule of public policy. It is not, therefore, an illegal contract. On the contrary, it is one which the bank might have made and performed without committing any unlawful act or exceeding its powers. Eastland County v. Chapman (Tex. Com. App.) 276 S. W. 654; Bolton v. City of De Leon (Tex. Civ. App.) 283 S. W. 213; State v. McFetridge, 84 Wis. 473, 54 N. W. 1, 998, 20 L. R. A. 223. The only factor that could affect the enforceability of the contract was the lack of authority in the city to accept that character of security. But that lack of authority could not have been invoked by the bank if sued upon the contract, nor can it be invoked in this proceeding by the banking commissioner. The city officials who conducted the transaction with the bank acted in good faith. The city performed its part of the contract by depositing its funds as they accumulated, until the bank was closed. Where an ultra vires contract, untainted by any illegality, has been performed by the corporation which has exceeded its authority, the other party cannot

plead that excess of authority as a justification for a refusal to perform his part of the agreement. Bond v. Mfg. Co., 82 Tex. 309, 18 S. W. 691; Scheussler v. Town of Mason (Tex. Civ. App.) 28 S. W. 42; City of Corpus Christi v. Central Wharf & Warehouse Co., 8 Tex. Civ. App. 94, 27 S. W. 803; Galveston & W. Ry. Co. v. City of Galveston (Tex. Civ. App.) 37 S. W. 30; Perkins et al. v. State, 130 Miss. 512, 94 So. 460; City of St. Louis v. Davidson, 102 Mo. 149, 14 S. W. 825, 22 Am. St. Rep. 764; Bigelow on Estoppel, 61, 501.

In this instance the bank had received the benefits of the deposits made by the city upon the faith of the bonds which had been pledged as security, and the city is now only asking for the enforcement of an obligation which the bank had the power to make. If a contract of this character in which the bank had mortgaged its own property may be enforced, there is under the facts of this case no reason why the contract mortgaging the bonds of the interveners may not also be enforced. The bonds were in the lawful custody of the bank, and there was nothing to create a suspicion that the bank did not own them. The evidence shows that the bank did in fact own $5,000 worth of those bonds. We therefore conclude that the court erred in holding that the city had no valid lien on the bonds.

That portion of the judgment of the trial court which allowed the city's debt against the banking commissioner as a preferred claim will be reversed and judgment here rendered classifying that debt as a general claim. That portion of the judgment which awarded the title and possession of the bonds to the interveners will also be reversed and judgment here rendered foreclosing the lien of the city of Longview on all the bonds pledged by the Commercial Guaranty State Bank as security for the city deposits.