The People of the State of Illinois ex rel. Oscar Nelson, Auditor of Public Accounts of the State of Illinois, Complainant, v. Citizens State Bank of Durand, Defendant.

M. B. Dolan, Trustee, Appellee, v. Citizens State Bank of Durand. George D. Banning, Receiver, Appellant.

Gen. No. 8,775.

Opinion filed May 10, 1934.

SMITH & RECKHOW, for appellant.

B. A. KNIGHT, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.

Citizens State Bank of Durand, Illinois, by resolution of its board of directors, suspended business on July 29, 1932. On August 18, 1932, George D. Banning was appointed receiver by the auditor of public accounts, who subsequently instituted this suit to liquidate the affairs of the bank. On October 28, 1932, M. B. Dolan, appellee herein, filed his verified

claim for a preference. Objections thereto were filed by the receiver, a hearing had and from an order of the circuit court directing the receiver to deliver to appellee three notes, each for the sum of $500 and one note for the sum of $400, together with a certain trust deed executed by Wayne L. and Hazel B. Morton to secure the payment of the same, the receiver has prosecuted this appeal.

The facts are not in controversy. Appellee, M. B. Dolan, was, on June 4, 1932, and for some time prior thereto, and was, at the time the bank closed, its cashier and a member of its board of directors. On June 4, 1932, Dolan was also trustee of the estate of Nelson C. Hoyt, deceased, and as trustee deposited on that day with the bank the sum of $1,712.76; that prior to making the deposit five of the directors of the bank verbally agreed with Dolan that at the first regular meeting of the board of directors, which would be held thereafter, the bank, in order to secure said deposit, would by proper resolution pledge with Dolan assets of the bank acceptable to him, and that a continuance of the deposit was contingent upon such action of the board; that on June 9, 1932, at a regular meeting of the board, seven of the nine directors being present, the following resolution was adopted, viz.:

"BE IT RESOLVED: That the President and Executive Vice-President of this bank be, and they are hereby authorized and empowered for and on behalf of this bank to pledge with Martin B. Dolan, Trustee of the Estate of Nelson C. Hoyt, deceased, and his assigns and successors as trustee of the Estate of Nelson C. Hoyt, deceased, as collateral security for the payment of any funds deposited by said trustee in this bank, any stock, bonds, evidence of indebtedness or other negotiable papers or securities belonging to this bank, and to make substitutions therefor from time to time, for the purpose of securing the payment of any such

funds to said Trustee and his assigns and successors and said President and Executive Vice-President are further authorized to execute for and on behalf of this bank, such agreement as to them shall seem proper providing for the sale of any or all of such collateral in the event of a default on the part of this bank, in the payment to the said Trustee, his assigns and successors in trust of any such funds as may be deposited in this bank by said Trustee.''

By virtue of this resolution, Dolan received from the bank three notes of $500 and one note of $400, executed by said Wayne L. Norton and Hazel B. Norton, together with a trust deed to secure the payment of the same, all dated September 10, 1927, which the bank held among its assets, and these notes and trust deed were held by Dolan at the time the bank closed. Upon the appointment of Banning, as receiver, however, Dolan delivered them to the receiver with the understanding that they were to be held by him until the question of ownership should be determined by the court. It further appears that the beneficiaries of the Hoyt trusteeship required that before any money should be deposited by Dolan in the bank, the bank should adequately secure such deposit.

Appellee expressly states in his brief that the fact that the funds which he had on deposit were held by him as trustee is immaterial, as he claims no preference by reason thereof, so that the question presented for decision is whether a bank organized and existing under the laws of this State may pledge some of its assets as security for a new deposit of private funds.

In *Texas & Pacific Ry. Co. v. Pottorff*, 54 Sup. Ct. 416, the Supreme Court of the United States held that the Act of Congress under which national banks are organized constitutes a complete system for their government, that the power to pledge assets to secure a private deposit was not granted in specific terms and

that the power to pledge assets is not incidental or necessary to the general business of banking and that no such implied power exists. It appeared in this case that the First National Bank of El Paso, Texas, failed on September 4, 1931. The Texas and Pacific Railway Company was then and had been a depositor. To secure it the bank had in January, 1931, pledged $50,000 Liberty bonds and held them for the railway in the trust department of the bank. Prior to January, 1931, the bank had secured the deposit of the railway company by surety bonds. In January, 1931, however, the bank, in order to be relieved from paying the premiums on the surety bonds, requested the railway to accept, in substitution for the surety bonds, the pledge of $50,000 Liberty bonds. The railway company assented only on the condition that it would be as fully protected as by the surety bonds and this assurance was given by the bank and its attorney. In reliance thereof, the substitution was made. In its opinion the court says: "To permit the pledge would be inconsistent with many provisions of the National Bank Act which are designed to ensure, in case of disaster, uniformity in the treatment of depositors and a ratable distribution of assets. . . . The effect of a pledge is to withdraw for the benefit of one depositor part of the fund to which all look for protection. Thereby the legitimate expectations of a great body of the depositors are defeated and confidence in the fairness of the national banking laws and administration is impaired. It is no answer to say that the other depositors are benefited by the increased resources which the pledge brings to the bank, or at least are not harmed, since the new funds take the place of the securities pledged and are available to meet liabilities. The immediate safety of unsecured creditors depends on the bank remaining open and solvent; the pledge reduces the fund of quick assets available to meet unusual

demands without any assurance that the deposit will be used to replenish this fund.'' The court then held that the receiver was not estopped to deny the validity of the pledge, but could assert that right without making restitution, that the bank itself could have set aside the transaction and that the railway company is entitled to a status of general creditor only.

In *City of Marion v. Sneeden,* 54 Sup. Ct. 421, it appeared that the city treasurer of Marion, Illinois, applied to a surety company to become surety upon his official bond as treasurer. The surety company agreed to do this provided he would get a bank which would give satisfactory collateral security for the repayment of his deposits of the public moneys. The City National Bank of Herrin agreed to do this and thereafter delivered to the Continental Illinois National Bank and Trust Company of Chicago, as escrow agent, negotiable bonds of the par value of $23,000 under an agreement to so secure the city's deposit. Thereupon the surety company executed the bond of the city treasurer and he made his deposits in the Herrin Bank as such treasurer. Subsequently the Herrin bank failed and the receiver instituted suit to have the pledge declared ultra vires and void and recover the bonds. In sustaining the contention of the receiver, the court in its opinion said: ''Banks organized under the laws of Illinois do not appear to possess the power of pledging assets to secure the deposit of public moneys of a political subdivision of the state. Illinois corporations have only such powers as are conferred by statute either expressly or by implication; and only those powers are conferred by implication which are reasonably necessary to carry out the powers expressly granted, *People v. Chicago Gas Trust Co.,* 130 Ill. 268, 22 N. E. 798, 8 L. R. A. 497, 17 Am. St. Rep. 319; *Calumet, etc., Dock Co. v. Conkling,* 273 Ill. 318, 112 N. E. 982, L. R. A. 1917B 814. No Illinois statute confers in express

terms upon banks organized under its laws either the general power to pledge assets to secure a deposit; or the general power to pledge assets to secure public deposits. A statute confers in terms the power to pledge assets to secure deposits of the States but there is none which so confers the power to pledge assets to secure public deposits of a political subdivision of the state. No reported decision rendered by any Illinois court since the enactment of the General Banking Law of 1887 holds that the alleged power exists as one incidental to the business of deposit banking. Nor is there any evidence that in Illinois such power is necessary in the conduct of the business of deposit banking.

"*Ward v. Johnson,* 95 Ill. 215, 217, decided in 1880, is relied upon as authority for the proposition that Illinois banks have power to pledge assets to secure deposits. That case arose under the charter of 'The Merchants, Farmers and Mechanics' Savings Bank,' which was granted long before the General Banking Act of 1887. The pledge involved therein was given to secure a transaction which appears to have been a loan as distinguished from a deposit. The transaction dealt with private funds. The statement was there made that banks have authority to pledge assets to secure deposits. If that statement expresses the law of the state, Illinois banks have had for more than half a century power to pledge their assets to secure private deposits as well as deposits of public moneys of its political subdivisions. But the case has never been referred to since on this point in any reported opinion of any Illinois court. During that period, many state banks have failed; and there must have been much litigation arising therefrom; but no exertion of the alleged power on the part of any state bank has been shown.

"An authoritative determination of the question whether Illinois banks have power to pledge assets to

secure the deposit of public moneys of a political subdivision of the state can be given only by its highest court. The District Court discussed, but did not decide, that question. Its decision dismissing the bill was rested on the ground that the National Bank Act as enacted in 1864 had conferred the general power to pledge assets to secure deposits; and that the power so granted had not been lessened by the later legislation. The majority of the Circuit Court of Appeals being of opinion that national banks lacked the power to pledge assets to secure deposits (except so far as conferred by the 1930 amendment) necessarily passed upon the applicable Illinois law. After careful consideration, it reached the conclusion that Illinois had not conferred upon its banks the power to pledge assets to secure deposits of political subdivisions of the state. Its reasons are set forth fully and persuasively; and the decisions of the courts of other states involving similar questions are fully reviewed. We cannot say that the Circuit Court erred in the conclusion reached.

"Since the Herrin bank was without power to make the pledge of bonds here in question, its receiver is entitled to recover them unconditionally in order that they may be administered for the benefit of the general creditors of the bank."

In *People ex rel. Nelson v. Seward State Bank,* 268 Ill. App. 32, the cashier of the bank, acting under the authority of a resolution of its board of directors, entered into a contract with a township school treasurer in which it was agreed that all funds thereafter deposited by the treasurer in the bank should be and "is hereby declared to be deposited as a special fund distinct and apart from all other funds and held in the said bank by it as a special trustee or agent of the said school and/or township treasurer." The evidence disclosed that the account was designated upon the ledger sheets as "special trustee account" but was kept and

handled identically in all respects with other commercial deposits and the moneys were not kept separate. This court held and the Supreme Court denied certiorari, that a banking institution was a creature of law and is possessed of only such powers and privileges as are authorized by statute; that the statute gives to banking institutions no authority to enter into secret agreements for the benefit or preference of one depositor over another; that such a practice, if countenanced, might work a great injustice and inflict financial loss upon the unsecured depositors and would allow large depositors to absorb all or the greater portion of the assets of a bank; that fair and uniform dealing by banks with all their depositors is contemplated by the law of this State and any secret agreement to protect one, while others are left without security, even though no actual fraudulent intent is apparent, is absolutely void and of no effect.

In *Knass v. Madison & Kedzie State Bank,* 354 Ill. 554, it was pointed out that under the provisions of our constitution, acts of the legislature creating corporations with banking powers do not go into effect unless and until approved by vote of the People, and that section 1 of the Banking Act, Cahill's St. ch. 16a, ¶ 1, provides that it shall be lawful to form banks for the purpose of discount and deposit, buying and selling exchange and doing a general banking business; excepting the issuing of bills to circulate as money. In holding that this statute did not confer power on a banking corporation to enter into a contract to repurchase, at a specified price, real estate mortgage bonds sold by it, and that such an agreement was void and a bank was not estopped to set up the invalidity of its agreement, the court said: "The rule long recognized and frequently announced by this court is, that a bank, incorporated under legislative charter, like other corporations so organized, has only such powers as are ex-

pressly conferred by the statute under which it is organized and such powers as are necessarily implied from the specific grant of power. Every power that is not clearly granted is withheld. Enumeration of powers granted implies exclusion of all others, and any ambiguity in the terms of the grant of power must operate against the corporation and in favor of the public. If a power claimed is withheld, the withholding of such power is to be regarded as a prohibition against its exercise." In answer to the contention that the purchasers of the bonds had executed their part of the agreement and it would not be good faith to permit the bank now to refuse to perform its part of the agreement, the court quoted from *Steele v. Fraternal Tribunes*, 215 Ill. 190, where it is said that a contract beyond the powers conferred by the legislature is not only voidable, but void, and of no legal effect, that it could not be ratified by either party because it could not have been authorized by either, and that when a contract is beyond the powers conferred upon it by existing laws, neither the corporation nor the other party to the contract can be estopped, by assenting to it or by acting upon it, to show that it was prohibited by those laws. The opinion then concludes: "A contract void because it is prohibited by law can in no manner be enforced. The law does not prohibit and also enforce a contract (citing cases). Complainants are chargeable with notice that the old bank was utterly without power to make these repurchase agreements. The defense of ultra vires is properly urged here."

In *Commercial Banking & Trust Co. v. Citizens' Trust & Guarantee Co.*, 153 Ky. 566, 156 S. W. 160, 45 L. R. A. (N. S.) 950, it appeared that the statute of Kentucky authorized banks in that State to do business upon the terms and conditions and subject to the liabilities prescribed in the statute. The statute ex-

pressly conferred the power to exercise, subject to law, such powers as may be necessary to carry on the business of banking, by discounting and negotiating notes, drafts, bills of exchange, and other evidences of debt, and purchasing bonds, receiving deposits, and allowing interest thereon, buying and selling exchange, coin, and bullion, and lending money on personal or real security, and it was held that this provision of the statute limits and defines the business of the bank and directs that its business may only be carried on by doing the things specifically enumerated, and that the enumeration of these powers excluded other methods of banking. In its opinion the court said: "In this case the bank has exceeded its express power and under the claim of the exercise of an implied power has attempted to secure the payment of a depositor by the pledging of its assets. This is clearly an act ultra vires and unlawful. No such power has been conferred upon banks in this state, nor should authority to do so be granted anywhere. . . . There is no implication from the powers granted and certainly it cannot be said to be necessary, in order to receive deposits and pay interest thereon, that the bank should secure, by pledge of its personal assets or mortgage of its real estate, the debt of its depositor or the interest that it has promised to pay. . . . Therefore, when deposits are received, the bank becomes a debtor to the depositor for the amount of the deposit, and, if it agrees to pay interest, for that also. These are the only terms and conditions regulating deposits and the payment of interest, and if, in addition to this, the bank may pledge its assets to the depositor, then it may exercise another most extraordinary power, which is not conferred by article 2, and not necessary for the conduct of its business. . . . The exercise of such power is therefore clearly beyond the terms of the law or any reasonable or necessary implication which the

court would be authorized to deduce from the language of the statute, and would tend to lessen the usefulness of banks as great public institutions by destroying public confidence in them. Such a practice, if indulged and authorized, might work great injustice and inflict financial loss, not only upon the depositors, but upon the stockholders as well. Large depositors, if secured, might absorb the greater part of the assets of the bank, and inflict loss upon unsecured depositors, and financial ruin upon innocent stockholders under the double liability law. The law contemplates, and was evidently framed to insure, fair and uniform dealings by the banks with all of their depositors. A secret pledge to secure one, while others are left without security, although it may be without specified intent to defraud, would nevertheless, in case of loss, justify such an inference. Public policy will not, therefore, tolerate a practice which might, sooner or later, in the event of financial trouble with the bank, enable it to pay and protect the favored few at the expense of the equally deserving many. If the fact was known that a bank had secured some one or more of its depositors, and left the others unsecured, no prudent person would deposit with it. No bank would advertise that it engaged in such a practice, because depositors who were not provided for would be driven away. The very fact that the transaction is one that will not stand the test of publicity is a strong argument against its legality, as well as its necessity. Banks publish statements of their assets, and individuals deposit on the faith of these published statements. It is well known that good statements as to assets induce people to deposit their money in banks making such statements. It would be a crowning act of injustice to hold that deposits thus induced are nevertheless cut off from sharing in these assets until some unknown favored few, who have been secretly secured, are satisfied; that it would be a pal-

pable fraud on the part of the bank thus to procure deposits, when its assets were secretly pledged. . . . The authority to borrow money and pledge the bank's assets therefor is not at all analogous to its power to pledge its assets in order to secure deposits. In the conduct of its business, it may become, and frequently is, necessary for a bank to convert its commercial paper into cash, and where it cannot do so conveniently or advantageously by rediscounting it, the bank, with perfect propriety, may borrow money upon the security of its assets; and this right is everywhere recognized as one of the implied powers which a bank has, and may exercise, where no direct authority authorizing it to borrow money is given. . . . There being no express authority given to a bank to secure a deposit by pledge of its assets, and it being apparent that such a practice would have a tendency, and pave the way, to the perpetration of fraud by putting it in the power of the officers of a bank to give a preference to favored customers, it cannot successfully be maintained that a bank has the implied right or power to do so. Banks undoubtedly have the right to do many acts and things not expressly authorized by their charters, or specifically designated in the general laws adopted for their organization, regulation, and government. These are termed implied powers, but such powers are those found necessary to enable the banks properly and expeditiously to carry out and enjoy the powers, rights, and privileges expressly given them. Before a bank should be adjudged entitled to exercise any power not expressly given, it should be clearly established that such power is essential to the proper conduct of its business, and necessary to enable it properly to enjoy, use and carry out its express powers. When such test is applied to the claim of right, on the part of a bank, to prefer one of its depositors over another, it is apparent that the right

should be denied. The exercise of such a power would necessarily be fraught with great possibilities for the perpetration of fraud, and would undoubtedly have a tendency to destroy the faith of the depositing public in banking institutions. . . . If banks are made to observe strictly the law, and not allowed to divert their assets from their proper and legitimate channel, it will be in rare instances indeed that depositors will feel the need of special security for their funds when placed in banks. Sound business banking principles demand that no bank should be permitted, under any circumstances, to secure any depositor by a pledge of its assets.''

In *State Bank of Commerce of Brockport v. Stone,* 261 N. Y. 175, 184 N. E. 750, 87 A. L. R. 1449, relied upon by appellee, it appeared that the State Bank of Commerce of Brockport, New York, lodged with the treasurer of the Farm Department of the Monroe County Farm and Home Bureau Association, certain bonds which were assets of the bank, in order to retain a deposit of the association and to obtain an additional deposit from it. The bank became insolvent and this was a proceeding brought by the superintendent of banks to recover the pledged bonds. The Court of Appeals held the agreement contrary to law, beyond the power and authority vested in the officers of the bank, and in its opinion pointed out that there was no statute in New York requiring or authorizing the pledging of assets of a State bank for the security of such deposits, stated that the association was a private deposit and called attention to the fact that the objections which have been made to the pledging of a bank's assets to secure such deposits are, first, that it gives extra, secret protection to the secured depositor at the expense of the unsecured; and, second, that the bank invites the public to deposit moneys upon a misrepresentation of its financial condition, as its published

periodical statements contain no mention of these secret withdrawals of its assets. The court cited numerous State and Federal decisions and concluded: "The few authorities which may seem to tend to an opposite conclusion have special features which distinguish them, or else have not been followed in the recent trend of authorities. *Leonard Co-Operative Creamery Ass'n v. First State Bank of Leonard,* 168 Minn. 28, 209 N. W. 631, was decided before *Farmers' and Merchants' State Bank of Ogilvie by Veigel v. Consolidated School District No. 3, of Kanabec County,* 174 Minn. 286, 219 N. W. 163, 65 A. L. R. 1407, above quoted. *Ward v. Johnson,* 95 Ill. 215, treated the money as if it were a loan. *Ahl v. Rhoads,* 84 Pa. 319, fails to discuss this point, and *Citizens' State Bank of Chautauqua v. First National Bank of Sedan,* 98 Kan. 109, 157 P. 392, L. R. A. 1917A, 696, dealt with a pledge authorized by statute.

"The prevailing view that banks are unauthorized in the absence of statute to secure private deposits by a pledge of assets has received favorable comment in the law reviews. See 45 L. R. A. (N. S.) 950, note; 77 Univ. of Penn. Law Rev. 916; 79 Univ. of Penn. Law Rev. 608; 41 Yale Law Journal, 1076; 22 Ill. Law Rev. 449.

"We share these opinions expressed by the highest courts of other states from which we have so copiously quoted. Reason as well as authority indicates that a bank has no implied power to pledge its assets as security for private deposits. To open the door to such a practice would permit officers and directors to favor their relatives and friends, submitting our entire banking system to justifiable suspicion. Faith in the honesty and integrity, impartiality, and fairness of our banks is the backbone of credit and the strength of commercial enterprise."

The court, however, in this case, held that inasmuch as the bank had received the benefit of the deposit, it

would not be just for the bank or its creditors to retain the deposit and refuse to perform the contract, and ordered that the pledged bonds need only be returned to the superintendent of banks upon payment of the full amount of deposit with interest.

Following the report of this case in 87 A. L. R. 1449, there is an annotation, beginning on page 1456, and after stating the holding of the reported case, it is said that the majority of the other cases which hold that a pledge of assets to secure deposits is ultra vires, hold that there can be no estoppel to set up the invalidity of the pledge. This was the holding of the United States Supreme Court in *Texas & Pacific Ry. Co. v. Pottorff, supra,* and *City of Marion v. Sneeden, supra,* and of our own Supreme Court in *Knass v. Madison and Kedzie State Bank, supra,* wherein the court declined to hold that because the bank received the purchase price of the bonds which it had previously sold, it was thereby estopped from setting up the invalidity of the repurchase agreement.

We unhesitatingly approve the language of the Circuit Court of Appeals used in *Sneeden v. City of Marion,* 64 F. (2d) 721, where it is said: "It does not appear to us as worthy of judicial approval that the secured depositor may take advantage of the ultra vires act of the bank and assert an estoppel grounded upon such act. It had no right, in making the deposit, to rely upon a preference in the form of an unlawful transfer of assets. Otherwise both parties, bound to realize the illegality of the transfer, might, in the face of such unlawfulness, agree to make the transfer, saying each to the other, 'though the transfer is not authorized by law, yet we will make it and accomplish the desired result despite its illegality, for neither may hereafter rescind without restoring the original status.' We do not approve of the accomplishment of an illegal result by way of any such unconscionable use of the doctrine of estoppel."

Finally counsel for appellee cite *Nelson v. Colegrove & Co. State Bank,* 354 Ill. 408, as sustaining his contention calling our attention to the fact that the Supreme Court there recognized the right of a pledgee to sell pledged property under a contract made by a State bank. That is true, but the facts in that case were that the State Treasurer deposited funds in his hands as State Treasurer in the Colegrove Bank, accepting as security therefor bonds which had been loaned to the president of the bank for that purpose by one of its stockholders. Counsel for appellee overlook par. 29, ch. 130, Cahill's Illinois Revised Statutes, 1933, which prohibits the moneys in the State Treasury to be deposited in any bank until such bank shall have deposited securities with the State Treasurer equal in market value to the amount of moneys deposited, and it was under this express authorization that the State Treasurer acquired the pledged bonds in order to insure the payment of his deposit of public funds. Par. 29, ch. 130, *supra,* and par. 11, ch. 16a, Cahill's Illinois Revised Statutes, 1933, which directs that a receiver of a closed bank shall deposit daily all moneys collected by him in a State or National bank selected by the auditor, who shall require of such depository satisfactory securities or satisfactory surety bond for the safe-keeping and prompt payment of the money so deposited, are the only references in our statutes concerning the pledge of assets of a bank to secure a deposit.

In the instant case appellee's deposit was not a special deposit in the sense that the identical money deposited was to be returned to the depositor, but it was identical in all respects with all other commercial deposits. Our Banking Act provides that banks may be organized to receive deposits, loan money and do a general banking business. If any power exists which authorized the board of directors to pass the resolu-

tion it did, and for the bank to pledge the Norton notes and trust deed to secure appellee's deposit, it must be found in this authorization to do a general banking business. In the *Knass* case, *supra,* it is said these words are used in their common and ordinary sense and that the usual powers exercised by banks in doing a general banking business are to loan money, discount notes, receive deposits and deal in commercial exchange. Unless the power to pledge its assets may be said to come within the meaning of the words "general banking business" or is necessarily implied by the authorization to do "a general banking business," it falls without the powers granted and is prohibited.

We do not regard anything we have said here to be in conflict with the decision in *Ward v. Johnson,* 95 Ill. 215, as the question presented for decision in that case was whether the Merchants, Farmers and Mechanics' Savings Bank had power to borrow money and issue investment certificates secured by a trust deed. In the course of its opinion, the court said that the bank was authorized to contract and agree with persons desiring to make deposits or loan money as to terms and that it might execute its bond, note or certificate as evidence of the indebtedness and secure the same by pledge or chattel mortgage or note, securities or by real estate mortgage or trust deed just as should be mutually agreed. The opinion then stated that no reason had been suggested and the court was unable to conceive any, why a system of securing loans and deposits generally in a particular way was objectionable. As stated in other cases commenting upon this decision, this opinion was written long before the present Banking Act became effective, and the court treated the transaction under consideration there as a loan and not a deposit. Furthermore, there was nothing secret about the transaction there involved, as the trust deed executed by the bank was of record, so all had notice, actual or constructive, of its provisions.

There being no express provision in our statutes authorizing the pledging of the assets of a State bank to secure a deposit of private funds and being clearly of the opinion that such power is neither implied nor necessary in order to carry out any of the powers expressly conferred by law upon a State bank, it follows that the resolution of the board of directors of the Citizens' State Bank of Durand and the subsequent pledge of the Norton notes and trust deed to secure appellee's deposit were ultra vires and void. Being illegal and void, we are further of the opinion that appellant is not estopped from setting up the invalidity of the action of the board of directors and he is entitled to retain the pledged assets for the benefit of all the creditors of the bank.

The order appealed from is therefore reversed and this cause is remanded to the circuit court with directions to enter an order denying appellee's claim for a preference, directing appellant, the receiver, to retain the Norton notes and trust deed for the benefit of all the creditors of the bank, and to allow the claim of appellee as a general claim only.

*Reversed and remanded with directions.*